**CARPENTERS DISTRICT COUNCIL OF NEW ORLEANS AND VICINITY, et al.**

v.

**DILLARD DEPARTMENT STORES, INC., et al.**

Civ. A. Nos. 89–3680, 89–3751.

United States District Court, E.D. Louisiana.

April 21, 1992.

William Lurye, Nancy Picard, Gardner, Robein & Urann, Metairie, La., R. Monroe Garner, New Orleans, La., for plaintiff class.

J. Forrest Hinton, Stephen P. Beiser, McGlinchey, Stafford, Cellini & Lang, New Orleans, La., for defendants D.H. Holmes, Ltd. and Dillard Dept. Stores, Inc.

## ORDER AND REASONS

FONSECA, United States Magistrate Judge.

These consolidated matters are brought pursuant to the Worker Adjustment and Retraining Notification Act (WARN), 29 U.S.C. § 2101 *et seq.* We granted plaintiffs' partial motion for summary judgment on most of the liability issues presented in this action on August 29, 1991.[1] Trial on damages and the remaining issues of liability was held between November 4 and 6, 1991. Subsequent thereto, the parties submitted stipulations, together with an itemization of damages that would be due each class member calculated according to the formula established by this Court in the aforementioned order.[2] Having considered the testimony of the witnesses, the exhibits, the stipulations submitted, and the argument, we are ready to enter our final findings and conclusions of law. To the extent any finding is considered to be a conclusion of law, it is to be so treated; to the extent any conclusion of law is found to be a finding of fact, it likewise is to be so treated. To the extent not inconsistent herein, we adopt and incorporate by reference the findings and conclusions contained in the previous opinions in this case[3] as well as the oral findings and conclusions entered on the record on November 6, 1991.

The history and background of this litigation are set forth in detail in an earlier opinion[4] and need not be recounted here. For purposes of this opinion, it is sufficient to recall that this class action arose as a result of the termination of employment by defendants, D.H. Holmes, Ltd. (Holmes) and Dillard Department Stores, Inc. (Dillard), in connection with Dillard's merger with Holmes on May 9, 1989, of employees assigned to the Canal Street retail store, Holmes' Corporate Planning Division, and two warehouse facilities. Notices of termination were delivered to all employees[5] who were later discharged on dates ranging between May 9, 1989 and July 22, 1989. The defendants failed to comply with the provisions of WARN which required a 60 day notice of termination to affected employees prior to a plant closing or mass

1. *Carpenters Dist. Council v. Dillard Department Stores,* 778 F.Supp. 297 (E.D.La.1991).

2. *Id.,* pp. 307–11.

3. *Id.* and *Carpenters Dist. Council v. Dillard Department Stores,* 778 F.Supp. 318 (E.D.La.1991).

4. *Carpenters Dist. Council,* 778 F.Supp. at 300–02.

5. There is a dispute whether two members of the class were personally presented termination notices. This issue is treated later in this opinion.

layoff, and are therefore liable for the damages provided by that statute.

## LIABILITY

█ Before proceeding to the calculation of damages, there remain two issues of liability that must be resolved and one prior finding that must be revisited.

In our prior Order and Reasons, we indicated that Holmes would have been responsible under WARN only for notification of employment terminations which occurred prior to its merger with Dillard, implying that Holmes alone would be liable for WARN damages due employees terminated on or before May 9, 1989, and that Dillard would be liable for WARN damages due employees terminated after that date.[6] We arrived at this conclusion by treating the dealings between defendants as a "sale" of Holmes' business to Dillard, and then literally applying the language contained in Section 2101(b)(1) of the Act to that transaction. We conclude, on reconsidering the evidence presented to us, that it was an error to treat the transaction between the defendants as a sale of a business and hereby vacate that portion of our prior opinion which so held.

Essentially, the agreement which the parties have loosely referred to from time to time in their argument as "the merger" consisted of a transaction between three corporate entities, Holmes, Dillard, and DDS Acquisition Corporation (DDS), a wholly owned subsidiary of Dillard. Upon approval of the plan by the respective stockholders of each corporation, DDS and Holmes would merge, with Holmes continuing in existence as the surviving corporation. All of Holmes' shares of common stock then would be acquired by Dillard in an exchange, at a predetermined formula, for Dillard's Class A Common Stock. There was no sale of Holmes' business or assets, merely a change in the ownership of Holmes' stock. Implementation of the

agreement made Holmes a wholly owned subsidiary of Dillard with both corporations continuing in operation subsequent to the May 9, 1989 "merger."[7]

Section 2101(a)(1) of the Act defines the term "employer" as "any business enterprise," however, the Act fails to provide either a definition for "business enterprise" or how parent-subsidiary relationships are to be treated. The final regulations promulgated by the Department of Labor contemplate treating a parent corporation as "the employer" under the Act, depending on the degree of control exercised by it over the affairs of its subsidiary.

> Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

20 C.F.R. § 639.2(a)(2).

Defendants have stipulated that Dillard was responsible for the decisions to close the business sites involved in this case, to terminate all employees, and when and to whom to send the WARN notices. The Agreement and Plan of Merger provided that, upon its effective date, the directors of DDS would be added as directors of Holmes and that Dillard could, after acquiring over one million of Holmes shares, require Holmes' directors to submit their resignations. (R., Joint Exhibit 19, paragraphs 1.4, 5.3.).

It is abundantly clear from the evidence that "but for" Dillard exercising its newly acquired powers under the Agreement as

---

6. *Carpenters Dist. Council*, 778 F.Supp. at 303, n. 9.

7. Applying the term "merger" to the relationship between Holmes and Dillard under their agreement would not be correct under the corporate law of Louisiana. Louisiana law contemplates the creation of a new corporate entity or, at least, the continuation of only one of the corporate entities involved in the merger. La.Rev. Stat.Ann. § 12:115.

Holmes' parent, no sites would have been closed and no employees discharged.[8] It is therefore proper to treat both Holmes and Dillard as the employer of all class members and impose on them joint liability under WARN.

## SEPARATE SITES OF EMPLOYMENT

Defendants contend that those employees that were assigned to the Holmes Planning Department and to its Riverbend warehouse, and who were discharged as a result of the merger agreement, were not entitled to notice under the Act since less than 50 employees from those respective sites were laid off. Under the Act, the definitions of both "plant closing" and "mass layoff" require that at least 50 employees be laid off at a "single site of employment." § 2101(a)(2) and (3). Determination of this issue, which was raised in defendants' motion for partial summary judgment, was deferred until additional evidence could be submitted at trial on the merits. Plaintiffs, while not disputing that the physical locations of the above sites were physically separate from other Holmes' sites, contend that the operations of the Planning Department, Canal Street store, and the Riverbend warehouse, Elmwood warehouse were so intricately intertwined with each other as to constitute two separate sites, i.e., the Canal Street store and Planning Department site and the Elmwood and Riverbend warehouse site.

On November 6, 1991, at the conclusion of the trial on the merits, we determined, for reasons orally assigned on the record, that the Planning Department and Riverbend warehouse are in fact separate sites and that there were insufficient numbers of employees assigned to those locations to fall within the Act. We adopt and incorporate herein our assigned oral reasons.

The Holmes Planning Department was located on Bienville Street in New Orleans, several miles distant from the Canal Street Store. Personnel assigned to the Planning Department were engineers, electricians, and carpenters who were responsible for the repair and maintenance of all of Holmes retail facilities, located both in and outside of the State of Louisiana. Several of the employees assigned to the Bienville location testified at trial that they spent a considerable percentage of their time working at the Canal Street store, however, that was due almost exclusively to the fact that the Canal Street store was the oldest of Holmes' properties and, consequently, required more maintenance than the others. On any given day, however, the Bienville site employees could be assigned work at any of Holmes' other outlets. The Bienville employees' payroll checks were issued from the Canal Street store, but this was an insufficient connection by itself to view the Bienville location and the Canal Street store as one site.

Similarly, there existed insufficient commonality between the Riverbend and Elmwood warehouses to consider them to be one site. The Riverbend warehouse was located approximately five to ten miles from the Elmwood warehouse. The Elmwood warehouse was solely responsible for ordering, storage and distribution of "hard ticket items"[9] to Holmes retail outlets. Riverbend performed the same function for merchandise considered to be "soft goods." Each warehouse had its own manager, who reported to a division vice-president who was located at the Elmwood warehouse. One employee was designated responsibility for personnel functions for both warehouses.

The two warehouses, although serving similar functions, that is, the storage and

---

**8.** During a hearing held on January 15, 1992, defendants' attorney capsulized the true relationship which existed between the two corporations:

I would point out for the record that I think it's clear from the facts that came out at trial, that it was Dillard's that prepared the notice, that it was Dillard's who made the decision about who would be terminated. So Dillard's

was right there in the thick of it preparing for the takeover. And that's what we think is critical in viewing the employer as two separate entities but ultimately one continuum. (R., Transcript, Proceedings January 15, 1992, p. 18).

**9.** Refrigerators, televisions and similar items.

distribution of goods to Holmes' retail outlets, operated independently of each other. Personnel were assigned to a particular facility and did not change places with employees at the other.[10] There was no evidence to suggest that, in Holmes' operations, the ordering, storage and distribution of hard ticket items at Elmwood had any bearing on or relationship to the performance of the same function regarding soft goods at Riverbend.

### EXTRA ON CALL EMPLOYEES

We also reserved ruling earlier on whether employees of Holmes who were designated as "extra on call employees" were in fact class members entitled to relief. Our concern, in pretermitting a decision, was an inability at the time to determine the work history of each extra on call employee to see if he or she would, in fact, be "affected" by the layoffs. As an obvious example, an employee who might be employed only during the Christmas season probably would not be considered an "affected employee" under the Act. On the other hand, one who worked part time each week would be affected by a layoff. All parties to this litigation now concede that those employees listed as "extra on call" worked part time each week of the year; therefore, despite their special title, those employees were simply no less than part time employees. We held in our earlier decision[11] that part time employees were covered under the Act.

### SPECIFIC ISSUES AS TO INDIVIDUAL CLASS MEMBERS

Defendants object to the inclusion of certain discharged employees as class members and to the starting date for the computation of damages as to others.

Defendants contend that they offered continued employment to three employees, Mary S. Krajcer, Juane Lamonaca, and Emelda Encalade, and that these employees refused the offered employment, thereby forfeiting any damages they were due under WARN. These employees, on the other hand, maintain that the jobs offered them were substantially different, both in pay and function, from the positions held by them prior to their discharge and that their refusal of defendants' offer does not prevent a finding that they suffered an employment loss.

An employee is not considered to have experienced an employment loss if the closing or layoff

> ... is the result of the relocation or consolidation of part or all of the employer's business and, prior to the closing or layoff—
>
>> (A) the employer offers to transfer the employee to a different site of employment within a reasonable commuting distance with no more than a 6–month break in employment....

29 U.S.C. 2101(b)(2)(A).

The regulations issued by the Department of Labor provide:

> (b) **Transfers.** (1) Notice is not required in certain cases involving transfers, as described under the definition of "employment loss" at § 639.3(f) of this part.
>
> (2) An offer of reassignment to a different site of employment should not be deemed to be a "transfer" if the new job constitutes a constructive discharge.
>
> (3) The meaning of the term "reasonable commuting distance" will vary with local and industry conditions. In determining what is a "reasonable commuting distance", consideration should be given to the following factors: geographic accessibility of the place of work, the quality of the roads, customarily available transportation, and the usual travel time.

---

**10.** There was testimony that several times a year a storewide warehouse sale would be held at the Elmwood warehouse and that personnel were taken from the Riverbend location to assist in the sale. However, personnel from many Holmes locations would also be assigned to Elmwood for the sale. The temporary assignment of Riverbend employees to Elmwood on those occasions would not be a sufficient basis to consider the two sites one.

**11.** *Carpenters Dist. Council,* 778 F.Supp. at 313–15.

20 C.F.R. § 639.5(b)(1), (2) and (3).[12]

A "constructive discharge" occurs when "... an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into involuntary resignation...." *Boze v. Branstetter,* 912 F.2d 801, 804 (5th Cir.1990). In such instances, the employee bears the burden of establishing that the "... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.,* at 804, citing *Bourque v. Powell Electric Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980) (quoting *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977)).

## MARY S. KRAJCER

■ Ms. Krajcer, prior to the merger, had been employed by Holmes as a retail buyer. In that position, she worked a 40 hour week for a salary of $36,000.00. She was required to work on weekends only if that coincided with a buying trip out of state, which occurred a few times a year. She had no administrative duties involving personnel and was eligible for periodic bonuses. On April 18, 1989, she was offered a position as a merchandising manager at one of Holmes retail outlets that Dillard was going to take over. In Dillard's organizational setup, the merchandising manager was second in charge of operations at the retail outlet. He or she had responsibility for the hiring and firing of store personnel and supervised approximately nine assistant sales managers. The position required the incumbent to work one or two nights a week and on Saturdays. Once or twice a month, the manager was required also to work on Sunday. Additionally, the manager would be required to open and close the store each day.

Mr. Roy Grimes, the Dillard executive who offered Ms. Krajcer the position of merchandise manager, testified in deposition[13] that when the merchandizing manager had to work a particular night, she could start work at 12:00 or 1:00 P.M. on the day she had to work late. Also, the manager could schedule a half day off during the week or a full day every other week. A merchandise manager, however, was not eligible to receive bonuses.

Ms. Krajcer, as we pointed out in our earlier opinion,[14] filed an unrelated action against defendants herein in another section of this Court to recover severance benefits due her upon her termination as a Holmes' employee. Defendants had refused to pay Ms. Krajcer the benefits, treating her decision not to accept the new job offer as a "voluntary termination of employment." Under Holmes' policy, an employee who voluntarily resigned or refused to except a job transfer which was "comparable" to the employee's previous position would not be eligible for severance

---

**12.** The corresponding interim regulation, which was in effect until April 18, 1989, was substantially different than the final regulation. That regulation provided at Section 639.5(b)(2):

> (2) The term "transfer" means that the new job is substantially equivalent in terms of pay and working conditions. The term "reasonable commuting distance" has the same meaning given to it by the Internal Revenue Service in 26 CFR 1.119–1(d)(4), i.e., consideration should be given to the following factors: geographic accessibility of the place of work, the quality of the roads, customarily available transportation, and the *usual travel time.*

53 FR 48890, Dec. 2, 1988; extended expiration date of April 18, 1989, 54 FR 13167, Mar. 31, 1989. Although the above three employees received notice before the effective date of the final regulations, we nevertheless conclude that the provisions of the final regulations apply on this issue. The Act itself does not address the type of job that must be offered to the transferred employee. Without historical or statutory guidance, one could conclude that a transfer to any job position might comply with § 2101(b)(2)(A) of the Act. Accordingly, we conclude that the more restrictive interpretation contained in the final regulations conforms more closely with the literal language of the statute. We need not consider the effect of reliance by either party on the interim regulation, as there is no evidence that anyone relied on or considered that regulation in the offer and rejection of the respective job transfers. To the contrary, the evidence demonstrates that the job offers were made in good faith by defendants to retain well qualified employees. There is nothing to suggest that the decisions on these job offers, by either side, were fashioned, at the time made, based on the possible consequences under WARN.

**13.** Plaintiffs' Exhibit 67.

**14.** *Carpenters Dist. Council,* 778 F.Supp. at 310.

benefits. Both the District and Appellate Courts found in favor of Ms. Krajcer[15] holding that the new job would not have been comparable to her old one, and, therefore, she would still be eligible for termination benefits despite her declination of the new job offer. Although that decision carries with it the effects of collateral estoppel, that is not helpful in this case because the issue of whether the old job was comparable to the new one is not relevant to our inquiry. The question in this case is whether the offer by defendants to Ms. Krajcer of the position of merchandising manager amounted to a constructive discharge. We think not.

The job offered Ms. Krajcer was a managerial position involving significant responsibility. Although radically different in nature than her former duties as a buyer, it certainly could not be viewed as a demotion. The new position required the use of managerial skills in which Ms. Krajcer claimed a lack of experience, however, she did not establish that she lacked the ability to handle those functions in the new position. Undoubtedly, because Ms. Krajcer would be receiving the same salary she did in her old position, any increase in time required to perform the new job would have the result of a "cut" in pay. It is unclear, considering Mr. Grimes' testimony[16] whether the additional time required by the new job would be as great as Ms. Krajcer contends; nevertheless, even if it would have amounted to an additional 20 hours of work per week, this by itself would not compel a finding that Ms. Krajcer was "constructively discharged." Ms. Krajcer has not established, considering a) the overall duties and functions of the position of merchandising manager, b) the fact that it was a relatively high managerial position, and c) that it would pay a starting salary of $36,000.00, that a reasonable person in her "shoes" would view the working conditions of that job to be so difficult or unpleasant as to feel compelled to resign. Accordingly, we find that defendants' offer to Ms. Krajcer of a position as merchandise manager of another store did not amount to a constructive discharge, and she is therefore not entitled to damages under WARN.

## JUANE LAMONACA

Juane Lamonaca, up until the time of her discharge on May 9, 1989, was employed as a buyer for Holmes. Ms. Lamonaca had been called as a witness on behalf of Ms. Krajcer at the trial in other proceedings. She testified that Mr. Grimes attempted in mid-April 1989 to offer her a job as an assistant store manager with Dillard, but she turned him down before he was able to tell her either the nature of the job or its location.[17] She added that she "... was not interested in working. [She] ... was ready to take off and stop working for a while."[18] Our line of inquiry at this juncture would ordinarily be to determine whether the job offer to Ms. Lamonaca would have amounted to a constructive discharge. We need not reach that issue because apparently there exists some confusion between the parties as to whether or not the conversation between Ms. Lamonaca and Mr. Grimes in April constituted a job offer by Dillard. Ms. Lamonaca evidently felt that a job offer had been made. Mr. Grimes, on the other hand, did not treat his conversation with her as having the effect of a formal job offer. In his

---

15. *Krajcer v. D.H. Holmes Co., Ltd.,* 951 F.2d 344 (5th Cir.1991).

16. Plaintiffs' Exhibit 67, pp. 29–30.

17. Def. Exh. 54, pp. 133–35. Plaintiffs have lodged an objection to the introduction by defendants of their exhibits numbered 52–55 and 74–76, which relate to the termination of Ms. Lamonaca and Ms. Encalade, on the basis that defendants failed to indicate in the pre-trial order that the class membership of these two individuals was at issue. Exercising our discretion, we hold that defendants may contest the class membership of these two former employees. Raising this issue after the pre-trial order had been prepared and filed is not prejudicial to these individuals. They have had an opportunity to respond and present deposition testimony on the issue. The complexity of the instant litigation and numerosity of its class members would, of itself, be justification for overlooking defenses against these two class members. Accordingly, plaintiffs' objection to the aforementioned exhibits is overruled.

18. Def. Exh. 52, p. 134.

deposition, Mr. Grimes was asked whether he had offered Ms. Lamonaca a job. He replied, "No, I did not." [19] Ms. Lamonaca received severance benefits when she was terminated. No evidence has been submitted to distinguish Ms. Lamonaca's situation from that of Ms. Krajcer's regarding the receipt of severance benefits. The obvious conclusion, which finds support in Mr. Grimes' testimony, is that Dillard did not feel that a bona fide offer of a job had been made to Ms. Lamonaca. We so conclude and find that Ms. Lamonaca is an affected employee entitled to WARN damages.

EMELDA D. ENCALADE

■ Ms. Emelda D. Encalade, an assistant buyer with Holmes at the time of her discharge, found herself in a factual situation not unlike that of Ms. Lamonaca. It is questionable, reviewing the facts involved in her discharge, whether Dillard considered that a bona fide job offer had been made to her. Ms. Encalade was involved in two job interviews with Dillard personnel.[20] During the first interview, which appears to have been nothing more than an attempt to ascertain employees' availability for future assignments, Ms. Encalade indicated the she would accept a job offer at any of Holmes' store locations with the exception of the facility located in Slidell, Louisiana.[21] She would not consider a job offer at the Slidell store due to the travel distance that would be involved between her home and that location.[22]

In mid April, Mr. Grimes met with Ms. Encalade for her second interview and offered her a position as manager of the cosmetic department of the Slidell store with an increase in annual salary of $1,000.00. Ms. Encalade told Mr. Grimes that was the one store to which she had said earlier she did not want to be transferred. Mr. Grimes told Ms. Encalade that he would get back to her. At that time she did not specifically decline the job offer.[23] Mr. Grimes never got back in touch with Ms. Encalade despite the fact that she left messages on several occasions with her secretary to call her.[24] Ms. Encalade was notified on May 3, 1989 that she would be terminated May 9th and would be eligible for severance benefits.[25]

Mr. Grimes, when questioned why Dillard paid Ms. Encalade severance benefits despite the fact that she refused a job offer, responded: "Well, again, I'm looking at the circumstances. But they [Ms. Encalade and a Ms. Sevin] were offered jobs outside of New Orleans, in other words out of town, which I thought had some bearing on the decision also." [26]

The evidence reflects that despite Ms. Encalade having objections to being assigned to the Slidell store, she never specifically refused the offer. It was her impression from her conversation with Mr. Grimes that he would attempt to see if a position with another store was available and would get back to her. He never did, and never acknowledged her attempts to contact him. The obvious explanation of the events involving this incident was that Mr. Grimes in effect "withdrew" Dillard's offer to transfer her to Slidell after she voiced concern over it and never offered her any other position. Apparently, he considered it unreasonable that she should be required to accept an out-of-town job. Defendants' decision to pay her severance

19. Plaintiffs' Exh. 67, pp. 44–45.

20. Def. Exh. 74, pp. 18–19.

21. Def. Exh. 74, pp. 13–14. Slidell, Louisiana is located in St. Tammany Parish and is geographically adjacent to Orleans Parish. However the New Orleans Central Business District, where Holmes' Canal Street store was located, and the Slidell city limits are approximately 25 to 30 miles distant from each other. Ms. Encalade lived in Algiers, Louisiana, which is part of New Orleans, but is located directly across the Mississippi River from the Central Business District.

The nearest access from Algiers to the Business District is a bridge crossing, involving travel of approximately three to five miles, and a ferry crossing which docks at the foot of Canal Street.

22. Def. Exh. 74, pp. 13–14.

23. Def. Exh. 74, pp. 16–20.

24. Def. Exh. 74, p. 21.

25. Def. Exh. 74, pp. 27–29.

26. Plaintiffs' Exh. 67, p. 41.

benefits supports the view that they did not consider that an effective offer had been made to her. Accordingly, Ms. Encalade will be included as a class member in this action.

## DARREN B. LABOURDETTE

Additionally, defendants contest the inclusion of Darren B. Labourdette as a class member contending that he voluntarily quit his job prior to the termination date indicated in his termination notice.[27] The present whereabouts of Mr. Labourdette are unknown, consequently, he could not be deposed on the facts surrounding his departure from defendants' employ. The parties nevertheless have stipulated that this employee was given his layoff notice on May 12, 1989, informing him that his employment would be terminated between the dates of June 10 and July 8, 1989. The parties have further stipulated that Labourdette's termination date was July 8, 1989.[28]

A computer entry in Holmes' business records, referred to as a print screen, reflects that Labourdette voluntarily quit.[29] Dillard's payroll records reflect that his last salary was for the week ending May 27, 1989. These two pieces of evidence are used by defendants to prove their contention that Labourdette voluntarily quit. Counsel for the plaintiffs suggest that Holmes' computer records are unreliable by pointing to several instances where the print screens reflected other employees had voluntarily resigned, and it was later determined they had not. Plaintiffs' counsel, however, does not dispute the accuracy of Dillard's payroll records. Although the payroll records, when viewed in conjunction with the print screen record, lend support to the defendants' contention,[30] we need not find that these records do in fact establish that Labourdette voluntarily resigned because plaintiff bears the burden of establishing that he was an affected employee. Without evidence to that effect from Labourdette, we find that he has failed to establish that he is a member of the plaintiff class.

## DAMAGE COMPUTATION STARTING DATES

Plaintiffs' claim that 18 employees[31] received "dual" notices, with the second notice containing a later termination date than the first notice; and that two employees, Clara M. Johnson and Phyllis Jackson Agee, did not receive any termination notice.

During the hearing held on January 15, 1992, we ruled, consistent with our earlier holding,[32] that since neither of the two notices received by each of the 18 employees conformed with the requirements of WARN, the Labor Department's regulations interpreting the effect of subsequent notices to an employee extending their termination date was not applicable. As to these employees, we will credit, as notice under the Act, that time between the dates the employee received the first notice and the earliest possible termination date reflected in that notice. Subtracting the sum of those days from 60, we arrive at the number of days for which those 18 employees are due WARN damages.[33] Defen-

27. "Employment loss" under WARN is defined as "an employment termination, other than a ... voluntary departure...." 29 U.S.C. § 2101(a)(6)(A).

28. On the surface, the stipulated termination date is somewhat confusing. While it would be reasonable to assume that this was meant to identify the last day worked by Labourdette, that is not the meaning given the stipulation by the parties. (R., Tr. Proceedings, January 15, 1992, p. 34).

29. Joint Exh. 64.

30. Labourdette worked in Holmes' restaurant which defendants argue closed around June 9, 1989. The majority of employees working in

Holmes' restaurant (J. Exh. 54, pp. 022943–022951) were discharged around June 10th. See Joint Stipulation, Exhibit A.

31. Joint Stipulation, Exhibits A and A–1.

32. R., Tr. Proceedings, January 15, 1992, pp. 5–8; *Carpenters Dist. Council*, 778 F.Supp. at 312.

33. We ignore in our computation the subsequent notices extending the employees' termination dates. Although we believe that the Act requires that we credit time reflected in the first notice as partial notice, an employer could ultimately circumvent the notice requirements of the Act if allowed partial credit for extensions of employment contained in a series of notices,

dants are entitled to a credit against those damages in an amount equal to any salary earned by the employee continued in employment past the earliest termination date in the first notice.

## PHYLLIS JACKSON AGEE

Phyllis Jackson Agee was working as an extra on-call employee in the cosmetic department at the Holmes' Canal Street store at the time of her discharge. She was terminated on June 30, 1989.[34] Defendants have no records to indicate that a notice of termination was personally presented to her. Ms. Agee testified by way of deposition[35] that she does not recall receiving or signing a notice of termination that was directed personally to her. However, as a result of conversations with fellow employees and notices circulating in her department, she was aware at the time of the merger that the Canal Street store would eventually be closing. She recalled viewing a termination notice identical to one dated May 12th directed to Mia Morris.[36] Ms. Agee believed that she viewed this document approximately two weeks before she was terminated. While she had expected Holmes to eventually lay her off, she did not know what that date would be, but expected it to be around July 7th.[37]

## CLARA MAE JOHNSON

Ms. Clara Mae Johnson worked for Holmes part-time as a telephone attendant prior to her termination on May 9, 1989.[38] In her deposition, she testified that she did not personally receive a notice termination letter, although her supervisor circulated a memorandum in her department approximately two weeks before she was discharged advising her that the Canal Street store would be closing.[39]

There is no evidence to suggest that the failure to provide these two employees personal notice of termination was the result of a conscious design on the part of defendants to do so. To the contrary, we believe, considering the efforts reflected in the record which defendants employed in their attempts to notify all employees affected by the merger, that the failure to send notices to these two employees was nothing more than an unintentional oversight. Despite the fact that neither employee received personal notice, both were aware, before the fact, of the intended closure of the Canal Street store and knew that they would be laid off.

Failure to provide notice to these two employees was a violation of the Act and would ordinarily allow them to recover damages for 60 days from the date of their actual discharge; however, we find that defendants were in good faith in this regard, and that they had reasonable grounds for believing that all affected employees, including Ms. Agee and Ms. Johnson, had been provided personal notices of termination. We, therefore, employ our discretion under § 2104(a)(4) of the Act and reduce the amount of penalties that would be due these two class members. We believe that Ms. Agee and Ms. Johnson should be treated in the same manner as if they had received the same notice as that received by those co-workers who were discharged at the same time. Accordingly, both Ms. Agee and Ms. Johnson, who were terminated on June 30th and June 3rd, respectively, would probably have been scheduled to receive the May 12th notice, which advised employees they could be laid off between June 10th and July 8th.

## PREJUDGMENT INTEREST

Plaintiffs seek an award of prejudgment interest at the rate established for the award of prejudgment interest under the law of Louisiana. Defendants oppose the allowance of prejudgment interest on the

none which in themselves provides for a 60 day notice of termination.

34. Joint Exh. 67, p. 15.

35. Joint Exh. 67.

36. Joint Exh. 67, pp. 13–14.

37. Joint Exh. 67, p. 20.

38. Joint Exh. 68, pp. 8, 15. The parties have stipulated, however, that she was laid off on June 3, 1989.

39. Joint Exh. 68, pp. 12–13.

grounds that it would amount to interest on a penalty and that the Act specifically limits claimants to the remedies contained therein, which does not include a provision for prejudgment interest.

■ Federal law governs the range of remedies, including the allowance and rate of prejudgment interest, where a cause of action, as in the present case, arises out of a federal statute. *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974); *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 983 (5th Cir. 1991).

■ Entitlement to prejudgment interest finds its genesis in 28 U.S.C. § 1961, which provides in relevant part, "[interest] shall be allowed on any money judgment in a civil case recovered in a district court." *See Guidry v. Booker Drilling Co.,* 901 F.2d 485 (5th Cir.1990). A determination of whether prejudgment interest should be imposed requires a two step analysis: does the federal act creating the cause of action preclude "... an award of prejudgment interest, and if not, whether an award of such interest would further the congressional policies of the [a]ct." *Id.,* at 488. *Hansen,* 940 F.2d at 984, n. 11.

Defendants argue that § 2104(b) of the Act, which directs that "[t]he remedies provided for in this section shall be the exclusive remedies for any violation of this chapter," precludes an award of prejudgment interest since the Act does not list it as a specific remedy. We disagree. Prejudgment interest, as we noted above, is authorized in appropriate cases pursuant to 28 U.S.C. § 1961. WARN's remedies, while exclusive, "... are in addition to, not in lieu of any other ... statutory rights and remedies...." 29 U.S.C. § 2105. Viewing these two provisions of WARN together, we are unable to say that Congress intend-ed to limit the Court's access to § 1961 to allow an award of prejudgment interest.

An award of prejudgment interest is warranted to further congressional policy under the Act. Congress in enacting WARN was concerned with the need to provide workers a period of time, free from unusual economic concern, to adjust to the prospective loss of employment.[40] Part and parcel of that policy was to guarantee that affected employees receive 60 days of pay for the transition period whether or not the business enterprise remained open for that period of time. The Act contemplated that employees would be receiving their salaries, or the equivalent thereof, contemporaneously with the 60 day notification period.[41] Once the 60 day period has passed, it cannot be recaptured, and the very economic harm which Congress attempted to alleviate by the Act will have been visited. The equivalent of the salaries not paid due to the employer's noncompliance of the Act would have to be found from other sources available to the employees, if any. Awarding prejudgment interest serves the dual purpose of making an employee whole by allowing for an adjustment in the value of money that an employee was supposed to receive in the past, in the instant case almost three years ago, and by providing an incentive to employers to promptly comply with their obligations under the Act.

Defendants further contend, however, that the Act, by allowing an award for 60 actual days of pay for failure to provide notice rather than the salary an employee would have earned during that 60 day period, imposes a penalty which should serve as adequate compensation in lieu of prejudgment interest. Defendants suggest that we held in our previous opinion [42] that damages due in lieu of notice was a "penalty." That term in our earlier opinion was used in a generic sense of something that becomes due when "triggered" by a failure to comply with another provision of the

---

**40.** See 20 C.F.R. § 639.1.

**41.** See § 2104(a)(3) of the Act which waives the civil penalty that would have been owed a local government if the employer pays, within three weeks of the plant closure, what it owes to each affected employee under the Act.

**42.** *Carpenters Dist. Council,* 778 F.Supp. at 308.

Act, rather than its strict connotation.[43] Accordingly, we find that plaintiffs are entitled to an award of prejudgment interest.

The rate of interest to be imposed on a judgment is within the discretion of the trial court. *United States v. Central Gulf Lines Inc.*, 747 F.2d 315, 320 (5th Cir.1984). Where the federal statute is silent on the issue, "... it is appropriate for the district court to look to state law for guidance in determining the rate of interest." *Hansen*, 940 F.2d at 984. The law of Louisiana would provide the applicable interest rate. However, because setting the rate of interest remains discretionary with the trial court, reference to some other standard for setting that rate, such as the rates applicable to postjudgment interest, established by 28 U.S.C. § 1961, has been found not to constitute an abuse of discretion. *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026 (5th Cir.1986).

The prevailing rate for prejudgment or judicial interest in the State of Louisiana for all litigation filed in the year 1989, the year in which the instant claims were filed, was 11.5%. Although Louisiana judicial interest is established by statute,[44] the yearly rates are subject to change due to the method, set forth in the statute, for computing them. The statute directs the state commissioner for financial institutions to compute an annual judicial interest rate each October preceding the year the rate will become applicable, based on the average prime or reference rate charged that month by Chase Manhattan Bank N.A., Citibank, N.A., Morgan Guaranty Trust Co. of New York, Manufacturers Hanover Trust Co. and Bank of America National Trust and Savings Association for their most favored corporate clients.[45] The judicial interest rate is then fixed at one percentage point above that average.

At the time the first Holmes' employees were laid off, the applicable federal postjudgment interest rate pursuant to 28 U.S.C. § 1961 was 9.15%.[46] Since that time, however, the federal rate has steadily declined until reaching a low on January 9, 1992 of 4.02%. We believe that the federal postjudgment rate applicable for the period between June 1 and June 28, 1989, which was 8.85%, would be a more appropriate prejudgment interest rate to make the class members whole, than Louisiana's rate. In deciding on this rate, we have also taken into consideration the difficulty that would be entailed, because of the large class, in computing interest from the date each employee was terminated. We therefore fix June 1, 1989, the approximate median date for all terminations, as the date prejudgment interest is to commence on the total amount awarded as damages in this matter.

Accordingly, judgment will be entered in favor of plaintiff class in the amount of $1,262,050.10,[47] together with prejudgment interest at the rate of 8.85% from June 1, 1989 to date of judgment and for all costs.[48]

---

**43.** The Act obviously provides an award of compensation for non-compliance. We need not determine whether recoverable damages should be construed as part compensation and part penalty since such a finding would not preclude an award of prejudgment interest. *Illinois Central Railroad Co. v. Texas Eastern Transmission Corp.*, 551 F.2d 943 (5th Cir.1977).

**44.** La.Civ.Code Ann. Art. 2924.

**45.** *Id.*, La.Civ.Code Ann. Art. 2924(B)(3)(a). The judicial rates of interest for the year 1988 was 9.75%; 1990, 11.5%; 1991, 11%; and 1992, 9%.

**46.** 52–Week T–Bill Rate of Changes, Administrative Office of the United States Courts.

**47.** This amount was arrived at by totalling damages due each employee contained in the parties' submissions, with appropriate adjustments made for damages which were modified in this opinion for certain individual employees.

**48.** Plaintiffs have moved for an award of attorney's fees which has been granted. A hearing has been set to determine the amount of fees to be awarded. Since this issue is collateral to the merits of this case, we will not withhold judgment awaiting a determination of attorney's fees.