OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION and its Local 4–612, AFL–CIO; William Wright; Antonio Romo; Saul Vasquez; and A.A. Mackinnon, for Themselves and All Others Similarly Situated, Plaintiffs,

v.

CIT GROUP/CAPITAL EQUIPMENT FINANCING, INC.; New York Life Insurance Company, Inc.; John Hancock Mutual Life Insurance Company; John Hancock Variable Life Insurance Company; Mellon Bank, N.A., Trustee; and Refinery Holding Co., L.P., Defendants.

Civ. A. No. H–93–3506.

United States District Court,
S.D. Texas,
Houston Division.

April 26, 1995.

---

452

Patrick M. Flynn, Houston, TX, for plaintiffs.

Steven Mark Zager, Weil, Gotshal & Manges, Houston, TX, for defendants.

### MEMORANDUM AND ORDER

WERLEIN, District Judge.

Pending are the Motion for Summary Judgment of Defendant Refinery Holding Company, L.P. (Document No. 28); the Motion for Summary Judgment of Defendants CIT Group/Equipment Financing, Inc., New York Life Insurance Company, Inc., John Hancock Mutual Life Insurance Company, John Hancock Variable Life Insurance Company, and Mellon Bank, N.A., Trustee (Document No. 31); and Plaintiffs' Motion for Summary Judgment (Document No. 35). After having carefully considered the summary judgment evidence, arguments, and authorities submitted by counsel, the Court is of the opinion that both of Defendants' motions should be GRANTED, and Plaintiffs' motion should be DENIED.

### I. Background

Plaintiffs in this case are (1) former employees of El Paso Refinery, L.P. ("EPR"), and (2) the union that represented a majority of these former employees, the Oil, Chemical and Atomic Workers International Union and its Local 4–612 ("OCAW"). Plaintiffs bring this action claiming that Defendants closed the EPR employment site and fired Plaintiffs[1] without first providing 60–days advance notice as required by the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101, et seq.

The uncontroverted summary judgment evidence reveals the following: Defendants CIT Group/Equipment Financing, Inc., New York Life Insurance Company, Inc., John Hancock Mutual Life Insurance Company, John Hancock Variable Life Insurance Company, and Mellon Bank, N.A., Trustee (collectively referred to as "the Term Lenders") provided financing to EPR, which owned and operated a refinery in El Paso, Texas. In connection with this financing, the Term Lenders held security interests in certain of EPR's assets ("the Refinery Assets"). On October 23, 1992, EPR filed a Chapter 11 bankruptcy petition, Case No. 92–13446–FM, in the United States Bankruptcy Court for the Western District of Texas, Austin Division ("the Bankruptcy Court"). The Bankruptcy Court appointed an Examiner, Mr. Richard Smith, on December 3, 1992, to assume control of EPR's operations, including the hiring and firing of employees. The Examiner retained most of the operations employees and maintained the refinery in a "warm shutdown" stage—that is, the refinery did not produce products, but remained in a position quickly to restart full operations if and when necessary.

On April 19, 1993, the Bankruptcy Court approved an agreement between the Term Lenders, the Examiner, and other EPR creditors whereby the Term Lenders were permitted to foreclose on the Refinery Assets. The category of "Refinery Assets" as defined in the Order of the Bankruptcy Court did not list employment contracts or employment agreements held by EPR, nor did it expressly exclude such. The Order, and the underlying agreement approved by the Bankruptcy Court, was simply silent on any assignment of employee contracts or agreements. On May 3, 1993, the day before the foreclosure, the Examiner was informed by representatives of the Term Lenders that the Term Lenders were not going to retain or hire any EPR employees. Upon hearing this, the Examiner decided that the EPR employees would have to be terminated.

---

1. References to "Plaintiffs" in the context of their treatment as employees, throughout this Memorandum, ordinarily are not intended to refer to the OCAW, their union, except insofar as it represents individual employees.

At the El Paso County Courthouse, El Paso, Texas, on May 4, 1993, at 1:27 p.m. M.S.T., the substitute trustee under the applicable deed of trust sold at foreclosure to the highest bidder the Refinery Assets. The Term Lenders were the highest bidder and, at their direction, the substitute trustee conveyed the Refinery Assets to Defendant Refinery Holding Company, L.P. ("RHC"), a company established by the Term Lenders for this purpose. At approximately 8:00 p.m. the same day, a representative of the Examiner informed the employees at the refinery that they would no longer be employed as of 11:00 p.m. that evening. The terminated employees' final paycheck was paid by EPR. Plaintiffs had not been given the statutory 60–days advance notice of their termination. EPR had provided a notice in November, 1992, but that notice failed to comply with statutory prerequisites. Plaintiffs have not named the Examiner or EPR as defendants in this case.

## II. *Discussion*

### A. *The Summary Judgment Standard*

Rule 56(c) provides that "[summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial burden of informing the district court of the basis for the motion, and identifying those portions of the pleading, depositions, answers to interrogatories, and. admissions on file, together with the affidavits, if any, which the moving party believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The moving party has the burden of showing that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Willis v. Roche Biomedical Lab., Inc.*, 21 F.3d 1368, 1371 (5th Cir.1994).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. *Celotex*, 477 U.S. at 322–24, 106 S.Ct. at 2553–54. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986). Unsubstantiated or conclusory assertions that a fact issue exists will not suffice. *See Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1442 (5th Cir.1993); *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir.1992). The nonmovant "must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *Krim*, 989 F.2d at 1442.

In considering a motion for summary judgment, the district court must view the evidence through the prism of the substantive evidentiary burden. *Anderson*, 477 U.S. at 253–54, 106 S.Ct. at 2513–14. All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, summary judgment is proper. *Kelley v. Price Macemon, Inc.*, 992 F.2d 1408, 1413 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 688, 126 L.Ed.2d 656 (1994), *citing Matsushita*, 475 U.S. at 576, 106 S.Ct. at 1351. On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." *Id., citing Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511.

Finally, even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 253, 106 S.Ct. at 2513. *Accord, Veillon v. Exploration Services, Inc.,* 876 F.2d 1197, 1200 (5th Cir.1989); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2728 (1983).

# 455

## B. *Who Should Have WARNed Plaintiffs?*

██ Defendants move for summary judgment on Plaintiffs' claim that Defendants were responsible under WARN for providing 60–days advance notice before terminating Plaintiffs' employment. Defendants assert that they cannot be held liable under WARN because at no time were they ever employers of Plaintiffs and at no time did they ever terminate Plaintiffs.

WARN provides that an "employer," defined as "any business enterprise that employs ... 100 or more employees," 29 U.S.C. § 2101(a)(1)(A), must give affected employees 60–days written notice prior to an employment site closing or mass layoff. 29 U.S.C. § 2102(a).[2] WARN further provides that "[a]ny employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable for each aggrieved employee who suffers an employment loss as a result of such closing or layoff...." 29 U.S.C. § 2104(a)(1).

Representatives of RHC and the individual Term Lenders have submitted sworn affidavits that their respective entities never employed any of the Plaintiffs. Plaintiffs have produced no controverting summary judgment evidence that Defendants exercised any employer functions with regard to Plaintiffs, such as hiring, firing, supervising, or paying them. *See Local 217, Hotel & Restaurant Employees Union v. MHM, Inc.,* 976 F.2d 805, 808 (2d Cir.1992) (Hotel management company was employer under WARN because it "bargained with, hired, fired, supervised, paid, and ultimately laid off the employees."). Additionally, it is uncontroverted that the Examiner, who *was* vested with employer powers over the EPR employees pursuant to his appointment by the Bankruptcy Court, made the decision to and did in fact terminate Plaintiffs.[3]

Despite this evidence, Plaintiffs advance two arguments for why the Court should nonetheless find that RHC and the Term Lenders were Plaintiffs' "employers" for purposes of WARN. First, Plaintiffs note that the Examiner terminated the Plaintiffs because of Defendants' decision not to retain or hire the EPR employees after the foreclosure. Plaintiffs therefore argue that because Defendants chose to "create this situation which resulted in the termination of employment for the individual Plaintiffs," Defendants were Plaintiffs' employers as a matter of law.

The authority cited by Plaintiffs for this proposition, however, is inapposite. The Court in *Finkler v. Elsinore Shore Associates,* 781 F.Supp. 1060 (D.N.J.1992), held that even a work site closing ordered by government authorities does not ordinarily exempt an employer from giving WARN notice, although it may fall under the "unforeseeable business circumstance" exception of 29 U.S.C. § 2102(b)(2)(A). Similarly, in *Local 217, Hotel & Restaurant Employees Union v. MHM, Inc.,* 976 F.2d 805 (2d Cir. 1992), the Second Circuit held that a hotel management company was the employer liable under WARN even though the company that owned the hotel ordered that the hotel be shut down. In both cases, the courts *rejected* the proposition that the entity that directed the work site shutdown is the employer, rather than the entity that actually hired, fired, supervised and paid the employees.[4]

---

2. The record indicates that approximately 140 to 160 employees were terminated shortly after the foreclosure.

3. The Examiner stated in his deposition:
Well, the decision to terminate was my decision, based on that a party from Malcolm Turner's staff informed my staff, including my counsel, that there would be no need or no use for any of the employees.... And the decision was strictly, what am I going to do with all these people with no refinery. So I had to terminate them.

4. The concurring opinion in *Local 217* would have also deemed the company that owned the hotel to be an "employer" on the grounds that the management company was "part of the parent or contracting company." 976 F.2d at 811 (Mahoney, J. concurring), *quoting* 29 U.S.C. § 2107(a). *See also Carpenters District Council of New Orleans and Vicinity v. Dillard Department Stores, Inc.,* 790 F.Supp. 663, 666–67 (E.D.La.1992) (both acquiring corporation [parent] and acquiree corporation [subsidiary] treated as employers under WARN), *amended,* 7 I.E.R. 799 (E.D.La.1992), *aff'd in part and rev'd in part on other grounds,* 15 F.3d 1275 (5th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 933, 130 L.Ed.2d 879 (1995). In the instant case, however, there is no allegation or summary

Plaintiffs' second argument is that Defendants automatically became "employers" by virtue of the foreclosure sale of the Refinery Assets. Defendants respond that even if the foreclosure sale of the Refinery Assets constituted a "sale" under WARN,[5] the sale did not involve a transfer of EPR's employees as is contemplated by 29 U.S.C. § 2101(b)(1), which provides as follows:

EXCLUSIONS FROM DEFINITION OF EMPLOYMENT LOSS.—(1) In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title, up to and including the effective date of the sale. After the effective date of the sale of part or all of an employer's business, the purchaser shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title. Notwithstanding any other provision of this chapter, any person who is an employee of the seller (other than a part-time employee) as of the effective date of the sale shall be considered an employee of the purchaser immediately after the effective date of the sale.

Pursuant to the authority granted it by Congress under 29 U.S.C. § 2107(a), the Department of Labor ("DOL") has interpreted § 2101(b)(1) as follows:

The full responsibility to notify any workers whose employment will be terminated as a result of a sale remains with the seller up to and including the effective date [time] of the sale and is then assumed by the buyer. According to the language of the Act, employees are always entitled to notice, i.e., at all times the employer is responsible for providing notice. For purposes of coverage under WARN, an employee of the seller becomes an employee of the buyer at the time of the sale.

20 C.F.R. § 639.4(c).[6]

■ In determining whether the "sales" provision of WARN only applies to sales involving the transfer of employees, the starting point is the language of the statute itself. If the language is clear and unambiguous, the Court may end its inquiry. *Carpenters District Council of New Orleans & Vicinity v. Dillard Department Stores, Inc.,* 15 F.3d 1275, 1282–83 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 933, 130 L.Ed.2d 879 (1995). If the statute is susceptible to more than one reasonable interpretation, however, then the reviewing court must look beyond the statute in an effort to ascertain the intent of the legislative body. *Id.*

The statutory language crucial to this case is the reference in § 2101(b)(1) to the "sale of part or all of an employer's business." The plain language of the phrase would clearly encompass a situation where the total ownership of a business changes hands (i.e., a merger, sale, or takeover of the control of company). In such a situation, the new ownership would, of course, automatically succeed to the obligations of the prior ownership, including employment contracts and agreements. The statute also applies to the sale of "part . . . of an employer's business." In *Headrick v. Rockwell International Corp.,* 24 F.3d 1272 (10th Cir.1994), the Tenth Circuit held that an agreed transfer of responsibilities at the government's Rocky Flats project, from its then plant managing contractor of 14 years, Rockwell International, to a new contractor, was a "sale" within the meaning of WARN, and was not a "termination" of employees under the Act. The agreement transferred all responsibilities for operations

---

judgment proof that EPR was at any time a parent or a subsidiary either of RHC or of the Term Lenders. To the contrary, the Term Lenders (and their nominee holding company) were merely third party secured creditors who, with a Court-ordered lifting of the automatic bankruptcy stay, were permitted to bid in at foreclosure the property securing the loans they had made to EPR.

5. Indeed, Defendants also strongly dispute that the foreclosure sale of the Refinery Assets by a substitute trustee pursuant to a deed of trust constituted such a "sale." The Court need not reach this question.

6. Accordingly, under the DOL interpretation of the word "date," if a sale takes place at 9:00 p.m., the notice responsibilities would shift from seller to buyer at that *time,* rather than at 12:00 a.m. the next calendar day. Defendants vigorously urge the Court to disregard the DOL regulation, arguing that the DOL has exceeded its delegated rulemaking power.

at that facility, and the transferee assumed the transferor's liabilities relating to the plant's operation "with the expectation that it would operate the facility with Rockwell's [transferor's] former employees." *Id.* at 1274. It was thus a sale of "part" of an employer's business within the meaning of § 2101(b)(1). On the other hand, no such agreement respecting employees and operations was present in this case. Instead, RHC and the Term Lenders merely foreclosed upon and purchased at the substitute trustee's sale only the specified assets of EPR's refinery that had been mortgaged pursuant to a deed of trust that was held by the Term Lenders to secure the repayment of their loans.

When assets of a business are purchased, rather than an ongoing business or part of a business, § 2101(b)(1) appears to apply only if the seller's employees are also transferred into the employ of the purchaser along with the purchased assets. The agreement to transfer the management and operating contract in *Headrick* did in fact contemplate and provide for the transfer of employees. 24 F.3d at 1273–74 & nn. 3–4, 1281. Additionally, in discussing the purpose and legislative history of § 2101(b)(1), Retired Associate Supreme Court Justice Byron White, writing for the Tenth Circuit, noted that "[i]n that section Congress explicitly stated that employees who find themselves *transferred from one company to another* because of a sale simply are not to be held by any court to have suffered a remediable 'employment loss'...." *Id.* at 1280 (emphasis added). The court also noted that Senator Hatch, in offering § 2101(b)(1) as an amendment to WARN, commented:

> There is no question that under [the WARN bill prior to inclusion of the sales exclusion], when a business is sold to another company and *the employees go off the old company's payroll and on the new one,* a plant closing for the purposes of this act has taken place.

*Id., quoting* 134 Cong.Rec. 16026, 16104–05 (1988) (emphasis added). In adopting § 2101(b)(1) then, Congress was clearly eliminating any risk that a transfer of employees during a sale of an employer's business could be regarded as a "termination" under the Act, and was delineating notice responsibilities when employees did move from one company to another.

Moreover, to hold that "sale of part or all of an employer's business," as used in § 2101(b)(1), includes asset sales where no employees are transferred would lead to anomalous and surely unintended results. For example, a car dealership that repossesses a fleet of cars from a car rental company could be deemed the "employer" of the car rental company's employees (and held liable for 60–days' wages per employee) should the rental company consequently shut down. This and other bizarre results could occur if the statute were construed to attribute to the purchaser of assets only, such as an asset bid in at a foreclosure sale, a liability for the defaulting debtor's responsibility to its non-transferred employees. The statute neither requires nor contemplates such an odd result, and this Court is obliged to apply the law Congress has written, not to engraft upon it a new mandate or liability. Accordingly, the Court concludes that § 2101(b)(1) applies only to sales of a company's total business and to sales of part of an employer's business that entail the transfer of at least some employees, and not to asset sales where there is no transfer of any employees.

From the summary judgment evidence, it is clear that the "Refinery Assets" that the Bankruptcy Court authorized the Term Lenders to foreclose upon did not include EPR's employment contracts and/or agreements. The detailed security agreement enforced by the Order made no mention of or provision for EPR's employees. None of EPR's employees was transferred to the employ of any Defendant by reason of the Refinery Assets foreclosure sale.

While the category of Refinery Assets did include "all contracts, agreements, leases of personalty and realty, easements, rights-of-way, licenses and permits that relate directly to the use and/or operation of the Refinery Assets and the Refinery's operations," the summary judgment evidence fails so much as to raise a fact issue that any of the parties to the agreement understood the EPR employees were included in this or any other clause

of the agreement. In addition to the RHC and Term Lender affidavits denying that Defendants ever employed Plaintiffs, Tim Bennett of Defendant CIT Group states in his deposition that, in speaking with a representative of the Examiner, "we made it clear that we were not taking the employees, we were not foreclosing on them, we were not giving them jobs, we were taking the assets." Additionally, in a letter to the Examiner's attorney, Adrian Overstreet, dated April 15, 1993, Defendants' attorney Candace Schiffman wrote "[i]f the Term Lenders either directly or indirectly through an acquiring entity ('the Acquiring Entity') become the successful bidder at the foreclosure sale, the Acquiring Entity will have no assets other than the Refinery Assets and no employees."

While the summary judgment evidence indicates that the Examiner had presumed that the Term Lenders (or whatever entity successfully bid in the Refinery Assets) would hire the EPR employees, nowhere in the record does the Examiner state that he thought that such an employee transfer was part of the Order authorizing foreclosure.[7] In fact, the record indicates that the Examiner well understood that Plaintiffs remained employees of EPR after the foreclosure. As the Examiner stated in his deposition:

> [T]he court would have crucified me if I would have kept 160 employees on payroll sometime after the refinery foreclosure, and they had no place to work. So we had to make a decision at that point. At that point, we had to terminate them since we would not have a refinery, and it was clear that—from a representative of Malcolm Turner's group, that these employees

would not be transitioned over to the refinery. I could not dispose of assets of the estate in that fashion.

The most that can reasonably be adduced from the summary judgment evidence, viewed in a light most favorable to Plaintiffs, is that RHC and the Term Lenders did not fulfill an oral promise to hire Plaintiffs after the foreclosure.[8] A breach of promise claim, however, is not raised by the pleadings of this case and raises no issue of fact on the motions before the Court. Plaintiffs have failed so much as to raise a fact issue that Defendants are liable under the WARN statute.

### III. *ORDER*

For the foregoing reasons, it is

ORDERED that Defendant Refinery Holding Company, L.P.'s Motion for Summary Judgment (Document No. 28) is GRANTED; Defendants CIT Group/Equipment Financing, Inc., New York Life Insurance Company, Inc., John Hancock Mutual Life Insurance Company, John Hancock Variable Life Insurance Company, and Mellon Bank, N.A., Trustee's Motion for Summary Judgment (Document No. 31) is GRANTED; and Plaintiffs' Motion for Summary Judgment (Document No. 35) is DENIED. Plaintiffs' Claims against Defendants are DISMISSED on the merits. Additionally, the parties' Joint Motion for Extension of Submission Date (Document No. 41) and Joint Motion for Extension of Time to File Joint Pretrial Order (Document No. 47) are DENIED as moot.

---

7. To the contrary, it would appear that the opposite was true. In his deposition, the Examiner discussed his understanding of "what the term lenders were offering" as follows:

> Q: But there weren't any major issues that were completely untouched in this document, as far as you recall; is that right?
> A: No major issues.
> Q: Okay. This document doesn't make any reference to the term lenders retaining the employees or hiring any employees, does it?
> A: It doesn't make any issue of that at all.

8. *See, e.g.,* Deposition of Plaintiff William Wright (Document No. 30, Exhibit H at 108), a refinery operations employee, as follows:

> Q: Do you believe that EPR should have been sued in this lawsuit?
> A: No. I believe CIT should be. They are the ones that offered us the job.
> Q: Okay. Is it your statement that EP—that the term lenders offered you a job, but never gave you a job? Never provided a job they offered?
> A: That's correct.
> Q: It's not your statement that they fired you from the job they had already given you?
> A: They offered me a—well, I won't say offered. I will go with, you say they guaranteed me a job. But they—it was not an offer. It was a guarantee.

In connection with their motions for summary judgment, Defendants have also sought recovery of attorneys' fees pursuant to 29 U.S.C. § 2104(a)(6), and have filed an affidavit in support thereof. The Court is of the opinion that the parties may be able to reach agreement on this issue before a final judgment is entered, and encourages them toward that end. If their discussions lead to an agreement, then the parties shall promptly submit to the Court its terms. If the parties are unable to agree on this issue, however, then it is

ORDERED that the parties may file supplemental submissions on the issue of attorneys' fees, not to exceed six pages in length for each side, on or before May 12, 1995.