24 F.3d 1272
 62 USLW 2799, 128 Lab.Cas. P 11,149,
9 Indiv.Empl.Rts.Cas. (BNA) 865,
18 Employee Benefits Cas. 1522,
2 Wage & Hour Cas. 2d (BNA) 57
 Thomas L. HEADRICK, Kathleen Headrick, Marie Rael, Mark A.
Pitts, Karen A. Pitts, William S. Armijo, and the
Class of All Persons Similarly Situated,
Plaintiffs-Appellants,
Jacqueline M. Brever, Plaintiff,
v.
ROCKWELL INTERNATIONAL CORPORATION, Defendant-Appellee.
 No. 93-1083.
 United States Court of Appeals,
Tenth Circuit.
 May 23, 1994.
 
 Bruce W. Sattler, (Natalie Hanlon-Leh with him on the brief) of Faegre & Benson, Denver, CO (Hartley David Alley, Wheat Ridge, CO, with him on the brief), for appellants.
 Daniel S. Hoffman, (Linnea Brown and Brent E. Rychener, with him on the brief) of Holme, Roberts & Owen, Denver, CO, for appellee.
 Before WHITE, Associate Justice (Ret.);* LOGAN, and EBEL, Circuit Judges.
 
 
 1
 WHITE, Associate Justice (Retired).
 
 
 2
 Appellants filed this action seeking damages from their erstwhile employer under, amongst other provisions, the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Secs. 1001-1461, the Colorado Wage Claim Act ("CWCA"), Colo.Rev.Stat. Sec. 8-4-104 (1986), and the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. Sec. 2101. The District Court, however, granted summary judgment to defendant on all scores. This appeal followed and we now affirm.
 
 
 3
 * On September 22, 1990, the United States Department of Energy ("DOE"), the government's overseer of operations at Rocky Flats, and Rockwell International Corporation ("Rockwell"), then the plant managing contractor of fourteen years, reached an agreement to transfer Rockwell's responsibilities under its Management and Operating Contract (the "M & O Contract") with DOE to a new contractor effective January 1, 1990.[1] Shortly thereafter, DOE named EG & G Rocky Flats, Inc. ("EG & G") to be Rockwell's successor and the parties negotiated a three-way agreement covering the details of the transfer (the "Transfer Agreement"). Pursuant to this Agreement, executed December 29, 1989, Rockwell voluntarily renounced its rights under the M & O Contract so that they might be assigned to EG & G;[2] the Agreement also provided for the assumption by EG & G of all of Rockwell's assets relating to the company's Rocky Flats division.[3] EG & G, meanwhile, assumed Rockwell's liabilities relating to the plant's operation, and did so with the expectation that it would operate the facility with Rockwell's former employees.[4]
 
 
 4
 In late September 1989, Rockwell informed employees at the plant of the impending transfer over the public address system. At about the same time all Rocky Flats supervisors received written notice regarding the transition so they could pass the information along to their employees. On October 20, 1989, EG & G's transition director distributed a written memorandum to all Rocky Flats employees indicating that the company would assume management of the plant effective the first of the year and assuring them that EG & G would retain all employees under the same terms and conditions they enjoyed with Rockwell.
 
 
 5
 As of January 1, 1990, nearly all of Rockwell's Rocky Flats employees were working for EG & G, including each of the appellants in this case. With regard to Rockwell's unionized employees, EG & G and the employees' elected bargaining representatives agreed that EG & G would assume and honor the existing collective bargaining agreement. With regard to Rockwell's salaried workers, EG & G sent each a written offer of employment promising the same salary and benefits as they had under Rockwell. Prior to December 31, 1989, all appellants (some are union members, others are salaried) had accepted, either personally or through a bargaining representative, EG & G's offer of employment effective January 1, 1990.
 
 
 6
 As a result of the Transfer Agreement and EG & G's assurances, no appellant lost a single day's wages or any accrued seniority; at the time, moreover, none made a claim for severance pay or earned vacation benefits. Some two years later, however, appellants filed this suit in federal district court, framing it as a class action (the class was never certified) and alleging that, under ERISA and state common law principles, Rockwell should have afforded nonunionized appellants severance pay benefits when it discontinued its management of the plant; that, pursuant to the CWCA, the company should have compensated all appellants, salaried and unionized, for accrued vacation benefits when it terminated operations; and, that the company owed all appellants damages for violating the WARN Act.[5]
 
 
 7
 On Rockwell's motion, the District Court entered summary judgment for the company on each count, which judgment appellants now challenge. We review the judgment de novo, asking for ourselves whether there is indeed a genuine issue of material fact remaining for determination by the fact finder or whether the movant is entitled to judgment as a matter of law; an issue of material fact is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When engaged in this enterprise we, of course, are obliged to view the facts before us and any reasonable inferences that might be drawn from them in a light most favorable to the nonmovant. See FED.R.CIV.P. 56(c). "However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof," Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)); and "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a properly supported motion for summary judgment. Anderson, 477 U.S. at 252, 106 S.Ct. at 2512. With these principles in mind, we now turn to the particulars of appellants' claims.
 
 II
 
 8
 * The nonunionized, salaried appellants first argue that when Rockwell discontinued its operations at Rocky Flats they became entitled to severance pay pursuant to a pair of company employee benefits plans; Rockwell's failure to provide the promised pay, they continue, amounted to an ERISA violation.[6] The District Court, however, held appellants unentitled as a matter of law to compensation under one Rockwell plan that, by its terms, explicitly applied to Rocky Flats employees. Appellants now seek reversal of the ruling on two bases. They contend, first, that the District Court erred by analyzing their claim under only one of the two employee benefits provisions they believe applies to them. And, secondly, appellants argue the court even misapplied the single plan it did discuss.
 
 
 9
 We think appellants' first argument easily dismissed. The undisputed facts reveal that one of the two Rockwell employee benefits plans they place before us was circulated exclusively amongst employees at the company's corporate headquarters and never provided for, nor was discussed with, employees at the Rocky Flats plant. The facts also reveal that the other plan, the one the District Court thought applied, explicitly stated that it governed benefits for Rocky Flats workers, was drafted by Rockwell's human resource manager at the plant, and was distributed freely to workers there. Two appellants have themselves indicated in sworn statements that, as with the human resources manager, they indeed understood that this latter plan controlled their work-related benefits. See Appellee's Appendix at 165, 174-75. On these facts, then, it is as plain to us as it was to the District Court that the Rocky Flats-specific plan, and only that plan, applied to appellants.[7]
 
 
 10
 Turning to consider the import of this plan,[8] we note that it does indeed promise severance pay, though only upon satisfaction of a significant condition: "Separation pay is granted employees laid off for lack of work." Appellants submit that their transfer to EG & G satisfied this condition, but the plain meaning of that phrase leads us in the opposite direction. After all, when an employee retains his job despite a transfer, he has not suffered for "lack of work." Moreover, inhering in the term "laid off" is the understanding the affected employee no longer holds the same job he did prior to being "laid off"; appellants clearly cannot satisfy this condition either. The difficulty of squaring appellants' claim to being "laid off for lack of work" with the ordinary meaning of the phrase is illustrated by the trouble we have in imagining any Rocky Flats employee describing himself to family, friends or, say, the local welfare office on January 1, 1990 as having just been "laid off for lack of work" after EG & G had provided him with the very same job and benefits he enjoyed with Rockwell the day before.
 
 
 11
 Our view regarding the plain import of the Rockwell provision is hardly without precedent. A number of other courts of appeals have faced remarkably similar severance pay promises under similar circumstances and construed them just as we do Rockwell's today. In Bradwell v. GAF Corp., 954 F.2d 798, 800 (2d Cir.1992), for instance, the Second Circuit held that
 
 
 12
 [b]y its plain language ... the Severance Pay Policy does not entitle appellants to recover. Only employees "permanently laid off for lack of work" are entitled to severance pay.... Where an employee is kept in his or her job because, despite a change in ownership, there is no lack of work, that employee cannot accurately be described as "permanently laid off because of lack of work."
 
 
 13
 The Sixth Circuit in Rowe v. Allied Chemical Hourly Employees' Pension Plan, 915 F.2d 266, 269 (6th Cir.1990) stated: "it is clear that ... plaintiffs' separation from Allied and immediate employment with Armco upon the sale of the Ashland plant did not constitute a layoff." Facing a provision that granted severance pay to employees "terminated by the Company as a result of job elimination," the Fourth Circuit also concluded it inapplicable by the transfer of employees to a successor corporation. Sejman v. Warner-Lambert Co., 889 F.2d 1346, 1347 (4th Cir.1989), cert. denied, 498 U.S. 810, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990). Likewise, too, the Eighth Circuit in Harper v. R.H. Macy & Co., 920 F.2d 544 (8th Cir.1990) found "the plan's language does not permit an interpretation that employees who continue to work without interruption on comparable terms for the purchaser of their employer's business have been 'permanently terminated' by the sale."
 
 
 14
 Allowing appellants severance pay in these circumstances would not only turn the plain meaning of the Rockwell provision on its head, but, as the District Court discussed, it would do the same to the primary intention behind the provision of severance pay. Several circuit courts, as with the District Court here, have noted that severance pay is largely afforded to help former employees minimize the privations of temporary unemployment while they seek new work. See, e.g., Awbrey v. Pennzoil Co., 961 F.2d 928, 931 (10th Cir.1992); Allen v. Adage, Inc. 967 F.2d 695, 702 (1st Cir.1992); Bradwell, 954 F.2d at 801; Jung v. FMC Corp., 755 F.2d 708, 113 (9th Cir.1985); Sly v. P.R. Mallory & Co., 712 F.2d 1209, 1211 (7th Cir.1983). Reading the Rockwell provision as mandating payment when a transfer of control has taken place and the employee has retained his same position without interruption would in no way advance this interest; indeed, rather than softening the blow of a period of unemployment, it would only serve to provide appellants a happy period of double income. And, as the First Circuit has indicated, it "beggars credulity" to suggest the ordinary employer would intend such an anomalous result "without some clear indication to that effect in the plan documents." Allen, 967 F.2d at 702.[9]
 
 
 15
 Before proceeding, we should note that our conclusion here does not begin to establish some formal rule that a period of unemployment or a diminution in income or benefits is an immutable precondition to recovery of severance pay. The plain meaning of Rockwell's "laid off for lack of work" provision would, for instance, easily cover an employee who is dismissed because there is not enough work to go round but who is fortunate enough to find a fully equivalent job on his own the next day. Moreover, allowing recovery in such an event, while resulting in a period of two incomes for the worker, would do no damage to the intentions behind the provision of severance pay for, as the Second Circuit has explained,
 
 
 16
 employees kept on by a plant owner's successor are in a different position from those who are laid off but find alternate employment. The former are not faced with the same risk of unemployment as are those who are permanently laid off because of lack of work. The Policy provision ensures that those laid off will not be discouraged from seeking alternative employment; it does not place appellants in the same position as laid off employees who may or may not find jobs.
 
 
 17
 Bradwell, 954 F.2d at 800.
 
 B
 
 18
 In their attempt to recover severance pay salaried appellants initially filed not only a federal ERISA claim against Rockwell, but also a state common law action for breach of contract. The District Court dismissed the contract claim, however, on the grounds that it "relate[d] to" an employee benefit plan and was, thus, preempted by ERISA. See 29 U.S.C. Sec. 1144.[10]
 
 
 19
 Appellants did not take issue with the District Court's disposition of the contract claim in their opening appellate brief; indeed, we learned of their disagreement with the court's decision on this score only with the filing of their reply brief. See Appellants' Reply Brief at 5. Without indicating any disagreement with the District Court's disposition of the contract claim, we prefer to hold the argument waived pursuant to the general rule that appellate courts will not entertain issues raised for the first time on appeal in an appellant's reply. See 9 J. Moore, Moore's Federal Practice p 228.02 [2.-3] at 28-13 (1993); 16 C. Wright, A. Miller, E. Cooper, E. Gressman, Federal Practice and Procedure Sec. 3974 n. 24 (1977 & Supp.1993); FED.R.APP.P. 28(a)(4) (appellant's opening brief is required to contain "the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statues and parts of the record relied on.").
 
 
 20
 The reasons for the general rule forbidding new arguments in reply are considered two-fold. First, to allow an appellant to raise new arguments at this juncture would be "manifestly unfair to the appellee who, under our rules, has no opportunity for a written response." Herbert v. National Academy of Sciences, 974 F.2d 192, 196 (D.C.Cir.1992). See also Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 3 (1st Cir.1983) ("In preparing briefs and arguments, an appellee is entitled to rely on the content of an appellant's brief for the scope of the issues appealed ..."). Secondly, it would also be unfair to the court itself, which, without the benefit of a response from appellee to an appellant's late-blooming argument, would run the risk " 'of an improvident or ill-advised opinion,' given our dependence as an Article III court on the adversarial process for sharpening the issues for decision." Id. (citation omitted). See also Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983).
 
 
 21
 Now, the rule against new arguments in reply is subject to some exceptions, see Herbert, 974 F.2d at 196, and it in no way forbids the court from "supplementing the contentions of counsel through our own deliberations and research," Carducci, 714 F.2d at 177. But, we see no compelling reason to deviate from it in this instance. If appellants wished us to consider the trial court's dismissal of their contract claim, they quite easily could have provided us and their opponent some notice to this effect in their opening brief where they argue for relief on many other grounds.
 
 III
 
 22
 Moving from severance to vacation pay, salaried and unionized appellants alike argue that Rockwell failed to compensate them for unused vacation time they had accrued with the company. This claim is premised upon the Colorado Wage Claim Act which requires an employer to provide his employees with payment for all earned compensation whenever "an interruption of the employer-employee relationship by volition of the employer" occurs. Colo.Rev.Stat. Sec. 8-4-104 (1986).
 
 
 23
 In assessing this claim, we find the trial judge's recitation of the crucial facts highly instructive. In ruling against the subclass of salaried employees with respect to vacation pay claim, the judge noted that EG & G had "voluntarily assumed from Rockwell the Plaintiffs' levels of seniority and their earned as well as future entitlement to vacation benefits." Appendix to Appellants' Opening Brief at A-41. He went on to conclude from this fact that "as Plaintiffs' accrued vacation benefits, which would have been paid by Rockwell had it continued under the management contract with the Department of Energy, were in fact paid by EG & G, Plaintiffs neither suffered any interruption in employment nor a loss of compensation benefits." Id. Thus, he held, no cause of action lay against Rockwell under the CWCA.
 
 
 24
 We entirely agree. Ordinary principles of contract law recognize that an obligor may effectively delegate performance to another who is willing to perform the delegated duty, though the obligor remains liable as surety unless the obligee consents to the delegation. See, e.g., RESTATEMENT (SECOND) OF CONTRACTS Secs. 318, 329 (1981); 3 E.A. Farnsworth, Farnsworth on Contracts Secs. 11.10--11.11 (1990); J. Calamari and J. Perillo, Contracts Sec. 18-18 at 667 (2d ed. 1977). Consequently, "if the delegate performs the duty, the duty is discharged," and obligor owes obligee nothing. 3 E.A. Farnsworth, Farnsworth on Contracts Sec. 11.11 at 136. Here, as the trial judge's opinion makes clear, it is uncontested that the salaried employees accepted from EG & G all the vacation pay due them. Unless the CWCA was meant to sidetrack ordinary contract law, which the District Judge plainly thought it was not, Rockwell's obligation to its salaried employees was discharged by EG & G's full performance.[11]
 
 
 25
 As for the unionized employees, the record reveals that prior to January 1, 1990 their collective bargaining agent assented to having EG & G assume Rockwell's obligations under the collective agreement and commit itself to satisfying union members' claims for accrued vacation pay. Thus, it is plain enough that for two related reasons unionized workers cannot recover against Rockwell. First, because the union consented to the delegation, as of January 1, 1990 Rockwell owed no accrued vacation pay to union members. Secondly, the obligation to provide vacation pay in this case is a creature of the collective bargaining contract, not of the Wage Act of Colorado, and prior to January 1, 1990 the contract had been amended to place the obligation to pay vacation pay accrued as of that date on the successor corporation that was to assume the collective contract. Under that contract, as amended, Rockwell owed union members no vacation pay.[12]
 
 IV
 
 26
 Appellants' final claim before us arises under the WARN Act, a relatively recent piece of congressional legislation requiring an employer who orders a plant closing or mass layoff to provide sixty-day advance written notification to individual employees or their representatives, else he "shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff." 29 U.S.C. Sec. 2104(a)(1). Before the District Court, salaried and unionized appellants alike argued that Rockwell's transfer of control to EG & G amounted to a mass layoff, that they suffered an employment loss, that Rockwell never provided the written notice required by the Act, and, thus, that the company was liable to them in damages. Rockwell, meanwhile, conceded that the several notices it gave employees of their impending transfer did not meet the Act's formal requirements that written and individualized notice be provided a full sixty days in advance of termination. It did argue, though, that several statutory exclusions and exceptions made clear that the Act's notice requirements were never triggered--viz. that the Act was never intended or designed to come into play when a company merely transfers its employees to a successor.
 
 
 27
 The District Court sided with Rockwell. It did so primarily on the ground that appellants had not suffered an "employment loss" as a result of their transfer to EG & G and, thus, that the Act by its own terms, was not triggered here. "Employment loss," the court noted, is defined by the Act as
 
 
 28
 (A) An employment termination, other than a discharge for cause, voluntary departure or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent of each month of any 6 month period.
 
 
 29
 29 U.S.C. Sec. 2104(a). The District Court quickly came to the conclusion that neither (B) nor (C) covered appellants' situation but found the question of subsection (A)'s potential applicability a bit more involved. The court admitted that appellants had been "terminat[ed]" by Rockwell but it thought the termination only a "technical" one since appellants were rehired at full pay by EG & G just a "millisecond" after their termination by Rockwell. After consulting the legislative history behind the "employment loss" term, the court came to the conclusion that Congress never intended the Act to cover a "termination" as ephemeral as this; rather, the court held, Congress meant "employment loss" to cover only employees truly idled or deprived of income.
 
 
 30
 On appeal, appellants suggest that the District Court's opinion defies and does damage to the plain meaning of the Act. By its explicit terms, they submit, subsection A of Sec. 2104(a)(1) triggers the Act whenever a "termination" is effected--save when the termination is for cause, a voluntary departure, or due to retirement. And, they point out, the District Court itself admitted they were indeed "terminat[ed]" and were so for none of the three statutorily excepted reasons. Consequently, as a matter of plain statutory meaning, appellants argue that their "termination," however "technical" it might have been, nonetheless amounts to an "employment loss" under the Act. That the trial court thought allowing any recovery here would be inequitable and in tension with congressional intent because appellants never suffered financially is, we are left to conclude, of no moment in the face of the statute's literal language. Rockwell, meanwhile, defends the District Court's reasoning, arguing as it did that we should "look[ ] to the underlying purposes of the WARN Act to determine whether an employment loss occurred in this case." And, the company insists that because "[n]o Rocky Flats employee ever faced the need to readjust, retrain, find new work or seek unemployment compensation"--since allowing appellants to pursue a WARN Act claim would not advance any of the Act's "underlying purposes"--we should hold their "termination" too insubstantial to merit the Act's protections.
 
 
 31
 We see no need to insert ourselves in this definitional debate over the word "terminate." Indeed, it is likely that Congress itself foresaw this debate when crafting the Act and provided for its resolution in 29 U.S.C. Sec. 2101(b)(1). In that section Congress explicitly stated that employees who find themselves transferred from one company to another because of a sale simply are not to be held by any court to have suffered a remediable "employment loss":
 
 
 32
 EXCLUSIONS FROM DEFINITION OF EMPLOYMENT LOSS.--(1) In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 3 of this Act, up to and including the effective date of the sale. After the effective date of the sale of part or all of an employer's business, the purchaser shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 3 of this Act.
 
 
 33
 29 U.S.C. Sec. 2101(b)(1). Under this provision, then, the obligation to warn employees in the event of a closure or mass layoff skips from seller to buyer, never triggered by the sale. Any argument to the contrary is simply foreclosed by the statute itself.
 
 
 34
 Though resort to the legislative history is hardly necessary to confirm this fact, it is worth pausing to note the sales exclusion's genesis. The provision was added to the Act after some Members of Congress expressed concern that without it adventuresome plaintiffs, perhaps not unlike appellants here, might well urge a court to hold "employment loss" to cover workers shifted from one employer to another as the result of a sale. The wording of the sales exclusion came from Senator Hatch who, in offering it as an amendment to the WARN bill, commented:
 
 
 35
 There is no question that under [the WARN bill prior to inclusion of the sales exclusion], when a business is sold to another company and the employees go off the old company's payroll and on the new one, a plant closing for the purposes of this act has taken place.
 
 
 36
 It would seem fairly obvious that if the business continues on as before with no significant changes of any kind, that there would be no need to go through the formal notification process. But that is not how the bill works.
 
 
 37
 ....
 
 
 38
 ... My amendment clarifies these points, I think. First, it clearly states that only a plant closing or a mass layoff as defined by this act, after the effective date of sale, would trigger the notice requirements. So it makes that clear. That is what I think the authors of the bill wanted to do to begin with, but they have not done so.
 
 
 39
 Second, it assigns liability for providing 60 days' notice of a closing or layoff after the effective date of sale to the purchaser. It basically defines that--an assignment of liability.
 
 
 40
 134 CONG.REC. 16026, 16104-05 (1988). Now, perhaps the sales exclusion was an unnecessary safeguard--perhaps the transfer of employees during a sale would not have qualified as a "termination" under the Act as originally introduced--but we have no need to pursue that question. Congress added clear marching orders specifically so that we might never have to face that question, directing firmly that no sale shall implicate the Act.
 
 
 41
 Our inquiry does not end here, however, for appellants contend that the "operation of Rocky Flats by Rockwell was not a 'business' which could be sold. The 'business' of operating Rocky Flats was defined by the M & O Contract which was not transferrable by Rockwell alone." They argue, in sum, that Rockwell's agreements with EG & G do not qualify as a "sale" of "part of" its "business."
 
 
 42
 This argument moves us very little. The undisputed facts reveal that Rockwell's M & O Contract with the government had not expired and was not terminated by DOE pursuant to any contractual provision; rather, Rockwell and DOE agreed to have Rockwell voluntarily transfer all its rights and obligations under it to EG & G. See supra n. 2. As a result, Rockwell and EG & G did directly exchange significant, if intangible, property rights for consideration through the Transfer Agreement. See supra nn. 3-4. Amongst other items, Rockwell ceded to EG & G its rights under outstanding subcontracts, leases, and the benefits of all its account receivables associated with the plant. In return, EG & G absolved Rockwell of responsibility for potentially substantial liabilities. Though the Act does not itself define the term "sale," we think this exchange for consideration qualifies as one under any reasonable definition of the term; it assuredly does amount to a "sale" under basic common law principles which require only the simple transfer of property for real consideration. See, e.g., 2 W. Story A Treatise on the Law of Contracts 185 (1874) ("A sale is a transfer of the absolute title to property for a certain agreed price.... Three things, therefore, are requisite to a valid sale: 1st. The subject to be sold; 2d. The price; 3d. The mutual consent of the parties.") (citation omitted); cf. U.C.C. Sec. 2-106(1) ("A 'sale' consists in the passing of title from the seller to the buyer for a price...."). And, it would be patently absurd to suggest the rights Rockwell transferred to EG & G under various subcontracts, purchase orders, leases, employment contracts and the like were not a "part of" its "business" of making a profit for its shareholder.[13]
 
 
 43
 Appellants attempt to avoid these commonsensical conclusions by referring us to a comment the Department of Labor ("DOL") added to its final regulations under the Act:
 
 
 44
 Several commenters suggested that the regulations incorporate a concept of "net employment loss" to cover situations in which an employer lays off one group of workers and hires another group to work on a different aspect of the same task or project. Other commenters suggested that the definition of employment loss exclude government service contractors; since when such employers lose their contracts, their employees ordinarily are hired by a successor contractor. Similarly, a commenter suggested that where work is contracted out and the contractor hire the former employer's old workers to perform the contracted work, no notice should be required unless more than a threshold number of employees are not rehired. These definitions cannot be squared with the definition of employment loss or the statutory structure, which focuses on the effects of employment losses on groups of workers. WARN requires notice to workers who lose their jobs with a particular employer, whether or not other workers have gained other jobs and whether or not other employers may hire those workers.
 
 
 45
 54 Fed.Reg. 16042, 16048 (April 20, 1989) (emphasis added). As appellants understand this comment, DOL has already considered and rejected just the reading of the Act we today adopt.
 
 
 46
 The comment, however, provides only the weakest support for appellants' position. In the first place, it is a purely interpretive rule, unpromulgated under the Administrative Procedure Act, see 5 U.S.C. Sec. 553(b)(A), and added here by DOL only to help clarify the meaning and application of the various promulgated rules that follow it. See Chrysler Corp. v. Brown, 441 U.S. 281, 301-04, 99 S.Ct. 1705, 1717-18, 60 L.Ed.2d 208 (1979) (explaining distinction between interpretive rules and substantive or legislative ones); 2 K. Davis, Administrative Law Secs. 7.5, 7.8 (1979 & Supp.1989) (same). Consequently, while it may be entitled to some consideration in our analysis, see Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), it does not carry the force of law and we are in no way bound to afford it any special deference under Chevron United States, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[14]
 
 
 47
 Secondly, and more tellingly, even if the comment were a regulation carrying the weight of law, it still would not control our decision here. After all, it does not discuss the sales exclusion and surely could not negate that express provision of the Act. Thus, if we are right that a sale transpired here--and we think we are--the comment is simply beside the point for our purposes, since as a legal matter it could only have meaning with respect to transfers of government contracts that do not involve sales between the incumbent and successor contractors.[15]
 
 V
 
 48
 Having waded our way through the doctrinal details of appellants' ERISA, CWCA, and WARN Act claims, it comes clear that appellants have raised no issue of fact that might necessitate a trial and that Rockwell is indeed entitled to judgment as a matter of law under each statutory regime. The District Court's grant of summary judgment is, therefore,
 
 
 49
 Affirmed.
 
 
 
 *
 The Honorable Byron R. White, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation, pursuant to 28 U.S.C. Sec. 294(a)
 
 
 [1]
 The written agreement between DOE and Rockwell, reflecting this understanding and dated October 23, 1989, provided for the "transfer of management and operating contractor responsibilities to the successor contractor," Appellant's Appendix at 188, including the "[t]ransfer to the successor contractor of all employer responsibilities." Id
 
 
 [2]
 The Transfer Agreement states in part: "WHEREAS, Pursuant to Modification Number M140 to the M & O Contract effective October 23, 1989, the Government and Rockwell have agreed to modify the M & O Contract to cause the cessation of Rockwell's responsibilities to manage and operate the [plant] and allow EG & G to assume such responsibilities effective at the beginning of the day shift on January 1, 1990...." Appellant's Appendix at 165
 
 
 [3]
 Rockwell's transfer to EG & G included: (a) the assignment and transfer of all rights and obligations under outstanding subcontracts, purchase orders, and leases; (b) the transfer from Rockwell to EG & G of all employer responsibilities; (c) the transfer to EG & G of Rockwell's responsibilities under the management and operating contract with DOE; and (d) all of Rockwell's outstanding accounts receivable balances as of the close of business on December 31, 1989. See Appellant's Appendix at 169-179, 191, 200-202
 
 
 [4]
 EG & G agreed, for instance, to (a) pay Rockwell's unpaid invoices for charges incurred, goods received, or services rendered to Rockwell in the ordinary course of business prior to January 1, 1990; (b) assume all of Rockwell's funding liabilities and responsibilities for employee benefit plans; (c) accept all of Rockwell's funding liabilities and responsibilities for employee welfare plans; and (d) accept all of Rockwell's outstanding accounts payable as of the close of business December 31, 1989. See Appellant's Appendix at 169-170, 200-202
 
 
 [5]
 Appellants raised a raft of other arguments in their complaint, but the three mentioned here are the only ones that remain for our resolution
 
 
 [6]
 29 U.S.C. Sec. 1132(a)(1)(B) provides that "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due him under the terms of his [employee benefits plan], to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan...."
 
 
 [7]
 Indeed, other than the bare fact that two separate employee plans exist within the Rockwell corporation, the only item appellants can point to intimate a meaningful dispute over the provision applicable to them is a statement in the provision circulated exclusively at Rockwell's corporate headquarters indicating that it applies "corporate-wide." Appellee's Reply Brief at 2. But, appellants give us no basis for believing that the term "corporate-wide" should be read applying to all Rockwell workers; indeed, given the document's limited distribution, just the contrary seems likely-- viz. that the provision was designed to govern corporate-wide in the sense of covering all, but only, corporate headquarters employees
 
 
 [8]
 Rockwell argues fleetingly that when interpreting its benefit plan we should accord its views about it deference under Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Like the District Court, however, we decline to take up the company's argument on this score for, as comes clear in what follows, we think appellants unentitled to severance pay even reviewing the contents of the benefit plan de novo
 
 
 [9]
 Appellants argue that a pair of cases nonetheless preclude the course we take here. See Bellino v. Schlumberger Technologies, Inc., 944 F.2d 26 (1st Cir.1991); Blau v. Del Monte Corp., 748 F.2d 1348 (9th Cir.1984), cert. denied, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). As regards Bellino, however, we are unsure of its precedential force given the First Circuit's subsequent decision in Allen, emphasizing that Bellino was decided on its facts and holding that sales and transfers of control generally will not trigger severance pay provision. See Allen, 967 F.2d at 700-702 (discussing the Bellino court's "repeated limitation of its discussion to the facts of record," and going on to hold that "it is probable, in the absence of language indicating otherwise, that a severance pay plan is geared to sheltering loyal workers from a precipitous loss of income.")
 As for Blau, the case is clearly distinguishable. The benefit plan there authorized severance pay upon the "eliminat[ion]" of an employee's position with the company, a quite different condition than the "laid off for lack of work" provision in the case before us. Indeed, one might more plausibly describe a Rocky Flats employee's job at Rockwell as "eliminated" at the end of 1989 than him as having been "laid off for lack of work." That said, of course, we do not now need hold that provisions using the term "eliminated" will always and everywhere trigger severance pay when a change of control takes place; in fact, we note that there is authority suggesting that even some provisions employing that term will not afford severance pay in a transfer. See, e.g., Sejman, 889 F.2d at 1350; Holland v. Burlington Industries, Inc., 772 F.2d 1140, 1149 (4th Cir.1985), aff'd sub nom., Brooks v. Burlington Industries, Inc., 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986). Our point here need only be that the term "eliminate" is somewhat broader than "laid off for lack of work" and, thus, cannot directly control our analysis.
 
 
 [10]
 That provision provides that "[e]xcept as provided in subsection (b) of this section, the provisions of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.... [Such laws include] all laws, decisions, rules, regulations, or other State action having the effect of law."
 
 
 [11]
 The District Judge's conclusion that the CWCA did not forbid Rockwell from delegating its duty seems to us a sensible construction of the statute since it nowhere explicitly discusses delegations or indicates who must come forward with the earned compensation upon an "interruption." Furthermore and in any event, we would think it very odd to construe the statute as requiring Rockwell to pay its employees for accrued vacation time which has already been paid in full by the delegate. Cf. J. Calamari and J. Perillo, Contracts Sec. 18-28 at 667 (noting that "[i]f the obligee deals with the delegate, he may no longer complain of the delegation" even if the duty itself was an otherwise nondelegable one)
 
 
 [12]
 Disposing of the union members' CWCA vacation claim as we do, we need not reach the question whether it is also formally preempted by Sec. 301 of the Labor Management Relations Act, see 29 U.S.C. Sec. 185(a), as the District Court did. We decide the union members' claim on different grounds than the District Court chose not to signal any disagreement with its conclusions, but simply because we find the route we take more economical
 
 
 [13]
 Appellants believe the fact that Rockwell did not use the term "sale" in describing its disposition of assets at Rocky Flats in its annual report is of some significance. We cannot agree, however, that the semantic label attached to the transaction in a report to shareholders necessarily governs our analysis of the nature of the transaction's substance
 
 
 [14]
 Whether the promulgated rules DOL has issued under the WARN Act are themselves due any Chevron deference is yet another question, one we need not address today
 
 
 [15]
 Given our holding regarding the statutory sales exclusion, we have no need to reach Rockwell's contentions that appellants' WARN Act claim is also barred by various other sections of the Act and the statute of limitations