80 F.3d 439
 64 USLW 2655, 20 Employee Benefits Cas. 1037,
Pens. Plan Guide P 23918Z
 James T. THORPE, Plaintiff-Appellee/Cross-Appellant,
v.
RETIREMENT PLAN OF the PILLSBURY COMPANY and the American
Federation of Grain Millers (AFL-CIO-CLC); and Group Life
and Health Insurance Plan for Hourly Employees Represented
by the American Federation of Grain Millers (AFLCIO-CLC),
Defendants-Appellants/Cross-Appellees.
 Nos. 95-4030, 95-4033.
 United States Court of Appeals,
Tenth Circuit.
 April 4, 1996.
 
 Appeal from the United States District Court for the District of Utah (D.C. No. 94-CV-96); David K. Winder, Judge.
 Charles B. Wolf, Vedder, Price, Kaufman & Kammaholz, Chicago, Illinois (George W. Pratt and Michael Patrick O'Brien, Jones, Waldo, Holbrook, Salt Lake City, Utah, and Ann M. Schlaffman, Vedder, Price, Kaufman & Kammaholz, Chicago, Illinois, with him on the brief), for Defendants-Appellants.
 Stephen W. Cook, Stephan W. Cook, P.C., Salt Lake City, Utah, for Plaintiff-Appellee.
 Before KELLY, BARRETT, and JONES,[1] Circuit Judges.
 PAUL KELLY, Jr., Circuit Judge.
 
 
 1
 Defendants, the retirement and welfare plans of Pillsbury Company ("Pillsbury") and the American Federation of Grain Workers (AFL-CIO-CLC) ("Union"), appeal the district court's order granting summary judgment in favor of Plaintiff James T. Thorpe on the issue of whether Plaintiff was entitled to early retirement benefits under Defendants' retirement and welfare plans. Plaintiff appeals the district court's order granting summary judgment in favor of Defendants on the issue of whether Defendants' actions constituted section 1024(b)(4) informational violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001-1371. Plaintiff also appeals the district court's dismissal of two other claims alleging violations of ERISA and its failure to award Plaintiff a reasonable attorney's fee and prejudgment interest. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm on all issues.
 
 Background
 
 2
 From 1966 until June 10, 1991, Plaintiff-Appellant James T. Thorpe was employed as a production worker at the Ogden, Utah plant of Pillsbury. During his tenure at Pillsbury, Plaintiff was represented by the American Federation of Grain Workers (AFL-CIO-CLC) ("Union") and participated in both the Retirement Plan, provided by Pillsbury and the Union, and the Group Life and Health Insurance Plan for Hourly Employees Represented ("Welfare Plan"), provided by the Union. The Welfare Plan supplements the Retirement Plan by providing insurance and medical benefits for those participants qualifying for normal, early or disability retirement under the Retirement Plan. Both the Retirement and Welfare Plans are "employee welfare benefit plan[s]" or "welfare plan[s]" as defined by ERISA and therefore are governed by ERISA. 1 Aplt.App. 10127. The Retirement Plan is administered by a six-member board ("Board"), three members of which are appointed by the Union and three by Pillsbury. See Id. at 10189.
 
 
 3
 The dispute in this case primarily involves the interpretation of 11.3 of the Retirement Plan, a provision which offers early retirement benefits for qualifying participants in the event of a Pillsbury "plant closure." Section 11.3 provides in pertinent part:
 
 
 4
 A Participant whose Continuous Service terminates as a result of a plant closure ... shall be entitled to receive a special early retirement benefit for life, if he has completed 25 or more years of Continuous Service at the time of the plant closure but has not attained his fifty-fifth birthday, with payments beginning on the first day of the calender month during which his Continuous Service terminates.
 
 
 5
 Id. at 10214.
 
 
 6
 On June 10, 1991, Pillsbury sold its Ogden, Utah facility to Cargill, Inc. ("Cargill"), discontinued its operations at the facility and laid off its employees; that very day, Cargill took over operation of the facility, answering phones, accepting deliveries and hiring new employees, one of whom was Plaintiff. Actual production under Cargill management began the next day. Sometime after Plaintiff joined Cargill, he and two other former Pillsbury employees (who were not employed by Cargill), all believing they were entitled to early retirement benefits under 11.3, filed claims with the Union. To resolve these claims, Pillsbury and the Union entered into a "Settlement Agreement and General Release" ("Settlement Agreement"), 1 Aplt.App. 10302, which was formalized as the "Amendment to the Retirement Plan of the Pillsbury Company and the American Federation of Grain Millers" ("Amendment"), id. at 10265. The Settlement Agreement and Amendment amended the Retirement Plan to provide special benefits to employees who had 25 years of experience with Pillsbury and were under the age of 55 (collectively known "Special Early Retirees"): (i) Special Early Retirees not offered employment by Cargill were entitled to pension and retiree health benefits as if they had attained the age of 55 on June 10, 1991, the date on which Pillsbury's ownership of the plant ended; (ii) Special Early Retirees who were offered employment by Cargill, such as Plaintiff, were to receive pension benefits commencing at the age of 55 and a $10,000 lump sum payment. Id. at 10266, 10302 p 2. Special Early Retirees opting to participate in the Settlement Agreement were required to sign a general release in favor of Pillsbury. Id. at 10302 p 5.
 
 
 7
 Plaintiff refused to sign the release and instead, filed a claim with the Board requesting early retirement benefits under 11.3. The Board denied Plaintiff's claim after determining that the Ogden, Utah plant in fact had not closed. Plaintiff filed suit seeking review of the Board's decision and alleging numerous ERISA violations. The district court granted Plaintiff's motion for summary judgment on the issue of whether the Ogden plant had closed; dismissed as moot Plaintiff's second claim, alleging that an amendment to the Retirement Plan violated ERISA by decreasing his accrued benefits; dismissed as moot Plaintiff's third claim, alleging that the Retirement and Welfare Plans violated ERISA by allowing different treatment for similarly situated employees; granted Defendants' motion for summary judgment on the issue of whether Defendants' actions constituted informational violations of ERISA; and denied Plaintiff's motion for attorney's fees and costs. This appeal, together with various cross-appeals, followed.
 
 Discussion
 A. Standard of Review
 1. Summary Judgment
 
 8
 We review de novo the district court's grant of summary judgment, applying the same standard employed by the district court under Fed.R.Civ.P. 56. Blue Circle Cement, Inc. v. Board of County Comm'rs, 27 F.3d 1499, 1503 (10th Cir.1994). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing a party's motion for summary judgment, the court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. Headrick v. Rockwell International Corp., 24 F.3d 1272, 1275 (10th Cir.1994).
 
 
 9
 2. Denial of ERISA Benefits.
 
 
 10
 We review de novo a denial of benefits under an ERISA plan "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956-57, 103 L.Ed.2d 80 (1989). If a benefit plan does give an administrator discretionary authority to construe doubtful provisions of the plan itself, the administrator's "decision must be upheld unless it was arbitrary and capricious, not supported by substantial evidence or erroneous on a question of law." Millensifer v. Retirement Plan, 968 F.2d 1005, 1009 (10th Cir.1992) (quoting Woolsey v. Marion Lab., Inc., 934 F.2d 1452, 1457 (10th Cir.1991)). If an administrator or fiduciary empowered to interpret the plan "is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' " Bruch, 489 U.S. at 115, 109 S.Ct. at 957 (quoting Restatement (Second) of Trusts 187, comment d (1959)).
 
 
 11
 In this case, we need not determine whether the Retirement Plan bestows upon the Board discretionary authority sufficient to warrant deferential review under Bruch. We conclude that the Board's actions, including its interpretation of the plant closure provision and its denial of early retirement benefits to Plaintiff, were arbitrary and capricious and therefore fail even under the most deferential standard.
 
 B. Denial of Benefits
 
 12
 In January 1994, the Board voted to deny Plaintiff's claim for benefits under 11.3. The Board unanimously agreed that Plaintiff was ineligible for early retirement benefits under 11.3 because Pillsbury's Ogden plant had not closed. 1 Aplt.App. ex. G at 10316, ex. I at 10320. Defendants refer to the definitions of "close" and "closure" in numerous dictionaries to argue that because the Ogden plant was not "brought to an end" or "shut up," closure did not occur. See Aplt. Br. at 15-16. According to Defendants, the Ogden plant could not have been "closed" unless operations were permanently shut down and the plant dismantled. We find this argument totally unpersuasive.
 
 
 13
 It is true that the June 10, 1991 transfer of ownership of the Ogden plant from Pillsbury to Cargill only slightly impacted normal operations. Phones were answered in the usual manner, and the plant accepted deliveries. 2 Aplt.App. 10444. All employees received normal wages for their work on June 10, 1991, the day on which Pillsbury's proprietary interest in the Ogden plan came to an end. Id. Production fully resumed on June 11, 1991 under the management and direction of Cargill. It is also clear that the sale of the plant did not only result in disadvantage to Plaintiff. Indeed, after the sale of the plant to Cargill, Plaintiff received a pay raise of eleven cents per hour. 2 Aplt.App. 10460. Undoubtedly, Plaintiff was fortunate to find employment the day following his discharge in the same job at the same facility.
 
 
 14
 The course of operations and Plaintiff's comparative advantages under either employer, however, are not indicators of whether the Ogden plant closed. Instead, the proper inquiry requires an analysis of the rights and liabilities assumed by Cargill, as Pillsbury's successor in interest, regarding the contractual relationship between Defendants and Plaintiff. Plaintiff's good fortune in finding employment in the same plant does not change the fact that the transfer of the Ogden plant to Cargill resulted in a fundamental shift in the rights and liabilities under Plaintiff's contractual relationship with Defendants, not the least of which was he was no longer employed by Pillsbury.
 
 
 15
 While it may be correct that certain contractual conditions remained the same after the sale, those were relatively minor. For example, the purchase agreement ("Purchase Agreement") between Pillsbury and Cargill provided that Cargill would allow its new employees to decide upon union representation, id. at 10465; grant waivers to newly hired former Pillsbury employees on any pre-existing conditions for their new Cargill health and dental benefits, id. at 10467-68; and allow newly hired former Pillsbury workers to keep their unused vacation time, id. at 10468. In other, more substantive ways, however, the change in ownership entailed dramatic changes in Plaintiff's conditions of employment. For instance, the Purchase Agreement did not provide for a transfer of the collective bargaining agreement with the Union; did not require Cargill to hire any past Pillsbury employee or observe any of Pillsbury's past terms and conditions of employment, id. at 10465; and, most importantly, refused to transfer the liabilities associated with Pillsbury's Retirement and Welfare Plans, providing that "[a]ll of Seller's Employee Welfare ... and Employee Pension Plans ... are specifically excluded from any assets and liabilities transferred pursuant to this agreement," id. at 10469.
 
 
 16
 In short, Plaintiff's coverage under the Retirement and Welfare Plans ceased upon the sale of the plant to Cargill. Accordingly, Plaintiff sensibly joined Cargill's pension, health and accident plans. However, Cargill's benefit plans differed from Pillsbury's Retirement and Welfare Plans. While Pillsbury paid all contributions to the Retirement Plan and paid qualifying employees a benefit upon retirement of $25 per year of company service, Cargill's plan pays qualifying employees a benefit upon retirement of only $19 per year of company service. Id. at 10508. Pillsbury paid all health premium costs for its Welfare Plan, while Cargill requires employees who choose family coverage to pay $65 per month to participate in the Cargill health and accident plan. Id.
 
 
 17
 It is precisely the alteration in the rights and responsibilities of Defendants that makes it clear that the Ogden plant closed, as that term is used in the Retirement Plan. Defendants' contractual liabilities did not evaporate when Pillsbury sold its proprietary interest in the Ogden plant to a buyer who specifically refused to assume such liabilities. If this provides Plaintiff "a happy period of double income," Aplt. Br. at 18, then so be it. If Plaintiff had found employment at another company's plant in Ogden or any other town, he would have been entitled to early retirement benefits under the Settlement Agreement and Amendment. See 1 Aplt.App. 10302 p 2, 10265. We agree with the district court that the Ogden plant closed, as that term is used in 11.3, entitling Plaintiff as a matter of law to the early retirement benefits under the Retirement Plan.
 
 
 18
 Because we affirm the district court's grant of summary judgment in favor of Plaintiff, we need not address the parties' arguments regarding whether (i) the Settlement Agreement and Amendment constituted a retroactive amendment of the provisions of the Retirement Plan in violation of 29 U.S.C. § 1054(g)(2), or (ii) the Board acted in an arbitrary and capricious fashion by offering special benefits to some but not all employees under 55 years of age with 25 years of service in violation of the Retirement Plan itself and ERISA regulation 26 C.F.R.s 1.401(a)-14(c).
 
 C. ERISA Informational Request Claim
 
 19
 The district court granted Defendants' motion to dismiss Plaintiff's informational request claim because only the Retirement and Welfare Plans, rather than the Board (the plan administrator), were parties to the action. 2 Aplt.App. 10521. ERISA requires plan administrators to respond to informational requests by plan participants. 29 U.S.C. § 1024(b)(4). "Any administrator who fails or refuses to comply with a request ... may in the court's discretion be personally liable to such participant ... in the amount of up to $100 a day...." Id. 1132(c). Such causes of action may be brought only against designated plan administrators, rather than the plan itself or the employer. See McKinsey v. Sentry Ins., 986 F.2d 401, 403 (10th Cir.1993). ERISA defines "administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. § 1002(16)(A)(i).
 
 
 20
 The language of § 1132(c) and § 1002(16)(A)(i) is unambiguous and admits of no other interpretation. Because the Retirement Plan specifically designates the Board as its administrator, 1 Aplt.App. 10189, the Board is the only party liable to Plaintiff under 29 U.S.C. § 1132(c). We affirm the district court's determination that Plaintiff cannot maintain this claim against Defendants as they are not designated "administrators" under ERISA. Accordingly, we need not reach the district court's further holding, citing Moothart v. Bell, 21 F.3d 1499, 1506 (10th Cir.1994), that even if Plaintiff were allowed to proceed against Defendants under § 1132(c), his claims would fail as a matter of law due the lack of evidence of either resultant prejudice or bad faith, see 2 Aplt.App. 10521.
 
 
 21
 D. Attorneys' Fees And Prejudgment Interest.
 
 
 22
 In January 1995, the district court denied Plaintiff's motion for attorney's fees and prejudgment interest. 2 Aplt.App. 10554. We review the district court's decision whether or not to award attorney's fees and prejudgment interest for an abuse of discretion, see Moothart, 21 F.3d at 1507, and will reverse only upon reaching "a definite conviction that the court, upon weighing relevant factors, clearly erred in its judgment," Gordon v. United States Steel Corp., 724 F.2d 106, 108 (10th Cir.1983).
 
 
 23
 ERISA provides that in any action brought by an ERISA plan participant "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In Gordon, this court specified five nonexclusive factors to guide the district court's decision in awarding fees and costs under § 1132(g)(1). 724 F.2d at 109. The district court in this case carefully considered and weighed each of the five Gordon factors, 2 Aplt.App. 10551-53, concluding that only the second factor, the ability of the Defendants to pay, weighed in favor of granting fees and costs, id. at 10553. While we might have reached a different conclusion regarding attorney's fees and prejudgment interest, the district court did not abuse its discretion in denying Plaintiff attorney's fees and prejudgment interest.
 
 
 24
 For the foregoing reasons, the judgments in Nos. 95-4030 and 95-4033 are AFFIRMED.
 
 
 
 [1]
 The Honorable Nathaniel R. Jones, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation